IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DIVISION OF FLORIDA
MIAMI DIVISION

CASE NO.:  05-21251 - CIV - ALTONAGA/BANDSTRA

MANUEL FIGUEROA, and DIXIE M. GARNER,
individually and on behalf of those similarly situated,

       Plaintiffs,

vs.

SHARPER IMAGE CORPORATION, a Delaware
corporation,

       Defendant.

_____

## AFFIDAVIT OF PROFESSOR GEOFFREY P. MILLER

### Background and Qualifications

1.      I am the Stuyvesant P. Comfort Professor of Law at New York University located in New York, New York.  I have been retained to provide an expert opinion in the above-captioned matter.  In that capacity, I make the following representations on the basis of my own personal knowledge.  If called as a witness, I could and would competently testify to the matters stated herein.

2.      For more than twenty years I have been involved in the area of class action litigation as a teacher, researcher, attorney, consultant, and expert witness.  I am presently teaching or have taught classes covering class action litigation, including Civil Procedure, Complex Litigation, Corporations, Professional Responsibility, and Securities Regulation.  I regularly lecture on class action litigation in continuing legal education seminars.

3.      I have acted as counsel in class actions and shareholders derivative litigation.

4.      I have published approximately a dozen research papers dealing with class action law and practice.  My articles on class actions have been cited by state and federal courts across the United States.

5.      I have consulted with numerous attorneys to assist with issues pertaining to class certification, class settlement, "reverse auction" class action settlements, and awards of class counsel fees.  I have been qualified as an expert and testified in class action cases in state and federal courts across the United States.

6.      I have consulted with counsel and have provided expert opinions to courts in overlapping class actions, including cases where an objector claimed that a proposed settlement was the result of a "reverse auction."  I am also the author of published studies on the topic, including "Overlapping Class Actions," 71 New York University Law Review 514 (1996) and "Full Faith and Credit to Settlements in Overlapping Class Actions: A Reply to Kahan and Silberman," 73 New York University Law Review 1167-1178 (1998).

7.      I have frequently consulted with attorneys regarding proposed class action settlements, and have testified in settlement fairness hearings in state and federal courts across the country.  My research papers on settlements include: "Competing Bids in Class Action Settlements," 31 Hofstra Law Review 633-650 (2003); "Settlement of Litigation: A Critical Retrospective," in Larry Kramer, ed., Reforming the Civil Justice System 13-37 (NYU Press 1996); and "Some Agency Problems in Settlement," 16 Journal of Legal Studies 189 (1987).  I am presently conducting a statistical study of more than 300 settlement agreements in class cases.

8.      I have also studied and provided expert testimony on attorneys' fees in class action cases.  With Professor Theodore Eisenberg of Cornell University, I am the author of "Attorneys Fees in Class Action Settlements: An Empirical Study," 1 Journal of Empirical Legal Studies 27 (2004).  Among other things, that paper analyzes all published opinions in state or federal court over a ten-year period in which the courts provided information about the fee award.

9.      I have conducted research and provided expert opinions on "coupon" and other non-pecuniary class action settlements.  My paper on this topic, "Nonpecuniary Class Action Settlements," 60 Law and Contemporary Problems 97-155 (1997) (with Lori Singer) has been

cited as authority by courts, and I have presented testimony and been recognized as an authority on the topic. *See In re Western Union Money Transfer Litigation*, 2004 WL 3709932 (E.D.N.Y. 2004) (referring to me as a "nationally recognized expert in the area of coupon settlements"); *In re Mexico Money Transfer Litigation*, 161 F.Supp. 2d 1002, 1017 (N.D. Ill. 2000) (characterizing me as having "particular expertise in . . . class action litigation" and as a "nationally recognized expert on coupon settlements").

10.     Further information on my background and qualifications is set forth my resume, attached to the Affidavit of Patrick M. Ryan ("Ryan Affidavit") as Exhibit 55.

Summary of Opinion

11.     I have been asked to provide certain opinions related to the fairness, adequacy and reasonableness of the proposed settlement.  Specifically, I have been asked to evaluate:

(a)     whether this settlement constitutes a collusive or "reverse auction" agreement;

(b)     whether the relief is well-designed and appropriate;

(c)     whether the request for attorneys' fees is reasonable; and

(d)     whether this case is suitable for certification for settlement purposes.

12.     I conclude that:

(a)     Counsel faithfully represented the class.  The record of this case provides no reason to conclude that this settlement is the result of an unethical "reverse auction."

(b)     The relief in this case is well-designed and provides a real and substantial benefit to class members.

(c)     The requested attorneys' fees are reasonable.

(d)     The case is suitable for certification as a settlement class.

Materials Relied On

13.     In preparing this opinion, I have reviewed pleadings and other documents in this case, including but not limited to the materials listed in Exhibit 56 to the Ryan Affidavit.  I have

also separately interviewed counsel for Sharper Image and for the class in order to obtain each side's perspective on the litigation and settlement of this case.

<u>The Litigation</u>

14.     The class action complaint (as amended) challenges certain advertising claims made by defendant Sharper Image Corporation ("Sharper Image" or "Defendant") regarding its Ionic Breeze® line of air purifiers ("Ionic Breeze®").  The complaint alleges that Ionic Breeze® products do not perform in the manner for which they were marketed, licensed, advertised, and sold, and further alleges that these products expose consumers to hazardous levels of ozone and other pollutants.  These allegations substantially overlapped those contained in parallel lawsuits pending in the California Superior Court in San Francisco (the "California Action").

15.     I understand from the Affidavit of David L. Aronoff that the following events transpired in relation to the settlement of this action:

(a)     The parties (including counsel in the California Action) entered into global settlement negotiations in January 2006 with the assistance of a retired federal judge.  These proved unsuccessful.

(b)     In May 2006 counsel for Sharper Image and lawyers for proposed representative plaintiff Manuel Figueroa met in California for depositions.  This meeting led for the first time to bilateral settlement discussions.

(c)     In June 2006 these parties participated in a formal mediation before the Hon. Thomas Scott, a retired judge.  Once again, the parties failed to reach agreement, and the litigation proceeded.

(d)     On October 30, 2006 attorneys for Sharper Image and Figueroa met in Atlanta, Georgia and attempted to settle the dispute with the assistance of mediator Larry Watson of Upchurch Watson White & Max Mediation Group, Inc.  After grueling discussions the parties agreed to a memorandum of understanding outlining the material terms of a proposed settlement. The parties refrained from discussing attorneys' fees at this time.

(e)     The parties began discussion of attorneys' fees only after finalizing the written memorandum of understanding.  Once again, they could not agree.  They attempted to mediate the issue of attorneys' fees in November 2006 but the discussions broke down.

(f)     The parties finally reached agreement on fees on December 27, 2006.

(g)     The parties reduced their separate agreements on the merits and attorneys' fees to a formal settlement agreement, which they executed on January 24, 2007.  In connection with the settlement agreement, an additional individual, Dixie M. Garner, was added as a representative plaintiff.

(h)     On January 23, 2007 this Court indicated that it would preliminarily approve the settlement if the parties provided explicitly that the settlement release does not apply to claims for personal injury.

(i)     In response to this Court's ruling, the parties clarified the settlement agreement to include an explicit sentence preserving claims for personal injury, and also to remove a non-disparagement provision.

(j)     On January 16, 2007 this Court entered an order that, *inter alia*, preliminarily approved the proposed settlement, approved a program of notice of settlement, set a date for a final fairness hearing, and enjoined the prosecution of other actions.

(k)     In the wake of this Court's preliminary approval order, the parties implemented the notice program as approved by the Court, including written notice in Sharper Image's March 2007 catalog, individual notice to class members in Sharper Image's database who did not receive the catalog, and summary notice published in April additions of *USA Weekend* and *Sports Illustrated*.

<u>Further Developments</u>

16.     I also understand from the Aronoff Affidavit that the parties continued to negotiate the settlement agreement after preliminary approval.  Several weeks prior to the June 22, 2007 objection deadline, Class Counsel became aware that the preliminary claims rate for the Merchandise Certificates was lower than anticipated.  At Class Counsel's instigation, the parties

began negotiations to address this problem.  On June 12th, these discussions culminated in a demand letter to Sharper Image.  In that letter, Class Counsel insisted upon several amendments to the settlement to improve the claims rate and otherwise enhance the settlement terms, including:  (a) enhancements to the class relief including making the $19 Merchandise Certificate available on a per unit rather than per household basis and making the OzoneGuard available for free; (b) an extension of the claims period through the end of 2007; and (c) new notice to the class of the enhanced terms.  Sharper Image accepted these demands in the Second Amended Settlement Agreement.

17.     Subsequent to those enhancements, the parties became aware of the *amici* opposition to the settlement by numerous state Attorneys General which relied heavily on the scholarship of Professor Christopher Leslie.  Obviously, the parties and their counsel treated the positions taken by the Attorneys General with the respect they deserved.  Class Counsel also saw the Attorneys General opposition as an opportunity to make additional changes to the settlement to further address the claims rate issue and improve other aspects of the settlement and made efforts to do so.  In the end, these efforts were an unqualified success.  The Third Amended Settlement Agreement eliminates the claim process in its entirety and takes every possible step to further encourage redemption of Merchandise Credits.

18.     These discussions were materially affected by the fact that the Attorneys General of 36 states filed an objection to the settlement.  The parties considered it important to address the concerns raised by the Attorneys General, and accordingly commenced a process that included both bilateral talks between class counsel and the defense attorneys as well as discussions with representatives of the Attorneys General.

19.     After further negotiations the parties reached a Third Amended Settlement Agreement dated July 30, 2007, which further enhanced the relief available to the class.  This agreement was approved by the Court, and provides that class members who opted out will be given another notice of the revised terms and afforded an opportunity to rejoin the settlement.

<u>The Settlement</u>

20.     The Third Amended Settlement provides for $19.00 Merchandise Credits with the following characteristics:

(a)     Sharper Image will make available (i) one Merchandise Credit for each Ionic Breeze® unit purchased by a class member at a price greater than $100; and (ii) one Merchandise Credit for all Ionic Breeze® products purchased by a class member at an individual price of $100 or less.

(b)     Merchandise Credits will be fully transferable by class members and by anyone to whom such credits are transferred.  Merchandise Credits can be transferred on the settlement Web Site or by means of a transfer form provided with the Notice of Final Approval.

(c)     Class members (other than third party resellers of Sharper Image products) may aggregate Merchandise Credits they receive pursuant to this settlement.  Any person receiving Merchandise Credits pursuant to a transfer may aggregate up to 5 transferred credits.

(d)     Merchandise Credits can be used for up to two years after the date of notice of final approval of the settlement.

(e)     Merchandise Credits can be used to purchase any products sold at Sharper Image stores, online or in its catalog, and are not limited to products branded by Sharper Image.

21.     The Third Amended Settlement provides that class members who purchased a unit without an OzoneGuard will be entitled to receive one OzoneGuard free of charge for each qualifying floor model unit.  Class members can obtain their free OzoneGuards from Sharper Image stores or at the Company's Web Site or by telephone, and will be entitled to free shipping for any item not obtained from a store.  In addition, for a one year period Sharper Image will sell OzoneGuards to any consumer at Sharper Image's cost, $7.00 per unit – a significant reduction from the pre-settlement price of $39.95.  Sharper Image agrees to make sufficient OzoneGuards available to meet anticipated demand.

22.     The Third Amended Settlement contains commitments by Sharper Image with respect to its advertising claims:

(a)      Sharper Image agrees to modify its advertisements for Ionic Breeze®
products by, *inter alia*: eliminating quantitative references to room size; removing the British
Allergy Foundation and Asthma and Allergy Foundation of America seals; refraining from
stating that Ionic Breeze® is a medical device; refraining from claiming that ozone produces
health benefits in connection with Ionic Breeze® products; and refraining from claiming that
Ionic Breeze® products remove harmful chemicals from flooring, paint or household cleaners or
confer immunity from allergies.

(b)      Sharper Image agrees to commence these advertising modifications no
later than 120 days from the effective date of the settlement.

(c)      Sharper Image consents to entry of an appropriate injunction to enforce
these modifications.

(d)      Sharper Image agrees to test Ionic Breeze® products for ozone emissions
using the UL 876 test protocol where applicable.

23.      The Third Amended Settlement contains a *cy pres* clause, under which, if Sharper
Image shows a positive net income after taxes for its last four fiscal quarters prior to the
expiration of the Merchandise Credit redemption period, and the redemption rate is less than
20%, then Sharper Image will pay 10% of its positive net income, or a different amount
determined by the size of the redemption shortfall, to an approved charity or charities.

24.      The Third Amended Settlement provides that Sharper Image will pay:

(a)      the costs of class notice;

(b)      the costs of claims administration;

(c)      incentive awards not to exceed $10,000 to each of the two class
representatives; and

(d)      counsel fees and expenses not to exceed $1,875,000.

25.      The majority of class members will receive their Merchandise Credits and rights
to acquire free OzoneGuards *without having to make any claim at all*.  Class members who are in
Sharper Image's database will simply receive a notice from Sharper Image informing them of the

number of Merchandise Credits and free OzoneGuards to which they are entitled, and supplying them with a code or codes which they can use to redeem the credits.  Claim forms are required only for class members who are not in Sharper Image's database.

## OPINION

## THIS IS NOT A COLLUSIVE SETTLEMENT

### General Considerations

26.     Overlapping cases have become nearly ubiquitous in consumer class action litigation.  The fact that the settlement of one case precludes continued litigation of overlapping cases is not, in itself, a basis for concern that the settlement is a product of collusion.  Any settlement of one case must inevitably resolve the claims of the competing cases.  If settlements were rejected simply because they extinguished claims in an overlapping case, many consumer cases would be impossible to settle at all.

27.     Nor is it a basis for concern that in this settlement the attorneys in the California Action will not receive a fee.  The risk of losing a fee as result of an overlapping settlement is inherent in class action litigation and is well understood by attorneys who litigate these cases.  This is, in fact, one of the reasons why attorneys in successful class cases receive compensation for the risk of non-success.

28.     The fact the California cases were filed earlier hardly provides a basis for invalidating this settlement.  There is no intrinsic reason why class interests would be best served by settling a first-filed action.  A rule that privileged the first-filed action would encourage an unhealthy race to the courthouse – a result that would benefit neither class members nor the legal system as a whole.

29.     The fact that this is a settlement class is also no reason for rejecting the settlement.  Many if not most consumer class actions are settled prior to certification.  While the presence of a settlement class may be a reason for careful judicial scrutiny of the settlement terms, it is not, without more, evidence of collusion among the settling parties.

30.     The following features are typical of reverse auction settlements:

(a)     the case is filed just before the settlement;

(b)     the case is never vigorously litigated;

(c)     settlement negotiations are perfunctory and lack genuine adversity;

(d)     counsel is disabled from negotiating effectively;

(e)     counsel has no adequate basis on which to determine the reasonableness of the settlement;

(f)     there are no bona fide reasons for settling in the forum;

(g)     the claims asserted in the settled case are significantly weaker than those presented in the competing case;

(h)     the relief obtained is inadequate when judged against the value of the claims being released;

(i)     the parties fail to separate the negotiation of the attorneys' fee from the negotiation of the merits; and

(j)     the requested attorneys' fee is unreasonably high.

31.     It should be noted that the presence of any one or even several of these features is not necessarily a basis for concern.  Cases where courts find strong evidence of collusion typically display many of these features.  However, I am confident in opining that the course in which these negotiations were conducted is emblematic of an arm's length process, one that counsel in all large scale class actions should strive to achieve.

<u>Timing</u>

32.     The timing of the settlement provides no ground for concern.  This was not a "drive by" settlement.  This case was filed in May 2005, nineteen months before the parties executed the original settlement agreement.

<u>Vigor of Litigation</u>

33.     The litigation in this case was hotly contested and adversarial:

(a)     Defendant Zenion claimed that this Court lacked personal jurisdiction over the claims against it.  Zenion was in fact successful at obtaining dismissal from this action on jurisdictional grounds.

(b)     Defense counsel deposed representative plaintiff Figueroa and four of plaintiff's technical experts: Terence O'Beirne, David Carlyle, Richard Shaughnessy, and Jeffrey Siegel.  Plaintiff's counsel deposed two Sharper Image witnesses, Robert Schultz and Andrew Parker.  I have reviewed these depositions and find not the slightest evidence of collusion among the parties.

(c)     Defendant vigorously challenged Figueroa's adequacy as a representative plaintiff and argued that the prerequisites for class certification were lacking. The question of certification was briefed and set for hearing before this Court when the parties hammered out their initial settlement agreement.

<u>Vigor of Settlement Negotiations</u>

34.     The settlement negotiations were hard-fought, adversarial, and conducted at arm's length:

(a)     As set forth in the affidavits of the respective counsel, the initial settlement was reached only after arduous negotiations which more than once resulted in impasse.

(b)     The parties exchanged hundreds of telephone calls, emails, and letters seeking to reach a compromise in this matter.  I have reviewed the written record of these negotiations and find no evidence of collusion or impropriety.  On the contrary, counsel for both sides displayed the highest degree of professionalism.

(c)     When they could not agree privately, counsel for the parties enlisted the assistance of not one but three highly qualified mediators.

(d)     It was only after more than a year of settlement negotiations that the parties were able to reach agreement.

<u>Credibility of Representation</u>

35.    Plaintiff's attorneys were able to negotiate credibly on behalf of the entire class:

(a)    The complaint sought recovery on behalf of all consumers in the United States who purchased air purifier products from Sharper Image for a six year period.  Because the complaint included all members of the settlement class, the class attorneys were able to back their demands with the credible threat of going to trial if negotiations broke down.

(b)    In "reverse auction" settlement counsel for the class may lack the resources to take the case through to trial, and thus cannot credibly negotiate against the threat of a litigated judgment.  This is not true here.  Plaintiffs' attorneys include highly experienced counsel with ample capacity to take this case to trial if necessary.

<u>Information Available to Class Counsel</u>

36.    Counsel had an adequate basis on which to assess the strengths and weaknesses of this case.  The information available to counsel was in fact more developed than in many class actions that have been approved by courts around the country:

(a)    Even prior to filing suit counsel reviewed extensive press coverage of problems with the Ionic Breeze® system.

(b)    Counsel had already litigated an air purifier case against a different defendant and were familiar with the technological and marketing issues associated with the air purification industry.

(c)    Counsel retained qualified technical experts on the topic of air purification.  These experts had knowledge of the Ionic Breeze® technology and of the degree to which the products performed as represented.

(d)    Counsel retained Intertek Testing Services, an outside facility, to conduct tests on Ionic Breeze® products.

(e)    Counsel deposed technical and management people at Sharper Image for purposes of class certification.  These depositions delved extensively into topics relevant to the

substantive merits of this lawsuit (indeed, Sharper Image moved to strike plaintiff's class certification evidence on precisely this ground).

(f)     Counsel conducted discovery on the question of this Court's jurisdiction over Zenion, and in the course of that process obtained licensing and research materials from both Sharper Image and Zenion.

(g)     Counsel obtained thousands of pages of marketing, advertising and other materials from Sharper Image during certification discovery.

(h)     Before settlement and during confirmatory discovery Sharper Image provided class counsel with all of the discovery materials that had been provided to counsel in the California Action.

(i)     Also as part of confirmatory discovery counsel spent the better part of a week in San Francisco interviewing representatives of Sharper Image and Zenion on issues going to the merits of the case.

<u>Venue</u>

37.     There were bona fide reasons for the parties to agree to settle the action in this Court:

(a)     Counsel for Sharper Image identified problems with the representative plaintiffs in the California Action – problems that presented a risk that any settlement could be collaterally attacked in another jurisdiction on the ground that the class did not receive adequate representation.  California counsel did not take affirmative steps to rectify these problems by substituting or adding additional representative plaintiffs even though Sharper Image gave them an opportunity to do so.  In contrast, when Sharper Image questioned the qualifications of Mr. Figueroa, the original representative plaintiff in the present case, the attorneys took affirmative steps to cure any possible defect by supplying another representative plaintiff not subject to the objections that had been lodged against Mr. Figueroa.

(b)     In a nationwide, consumer class action like the present case, a federal court may provide a superior forum for the resolution of disputes.  Federal courts have a national

perspective which may be a favorable factor in assessing the validity of nationwide relief. This perspective may be one of the reasons why Congress, in the Class Action Fairness Act, expressed a preference for federal court adjudication of class actions extending across state boundaries. A federal court has an advantage over a state court in terms of the ability to enforce and effectuate its judgments. While a federal court has the ability to enjoin competing state court litigation, a state court has no similar ability to enjoin litigation in federal courts or in the courts of another state.

(c)     The fact that Sharper Image is located in California is no reason why this settlement should take place in a California court. Perhaps a California settlement would be convenient for Sharper Image, but the Court's concern is not for the Defendant but rather for class members. Because class members are spread throughout the country, Florida is an appropriate venue for settlement.

<u>Strength of the Class Claims</u>

38.     The claims asserted here were not significantly weaker than those presented in the California Action, such that a reverse auction could be inferred.

(a)     The substantive causes of action being asserted in this action are essentially similar to those at issue in California. Thus there is no significant difference on the merits between the claims asserted in the two actions.

(b)     The California Action had already been certified as a nationwide class whereas the present case will be certified only if and when this Court approves the settlement. Although the certification of the California Action was potentially advantageous, the present action has advantages in other respects: (i) the California representative plaintiffs faced challenges to their adequacy which were not cured by counsel and (ii) a state court might not be able to enforce its decree as effectively as a federal tribunal.

14

<u>Value of the Relief</u>

39.      The initial settlement provided relief for the class which, in the professional opinion of class counsel, represented reasonable compensation given the strength of the claims and the financial position of the Defendant.

40.      The fact that the revised settlement agreement provides enhanced relief does not imply that the relief initially obtained was inadequate.  Indeed, it is not at all uncommon for parties to amend a settlement agreement after preliminary approval, and offer the class enhanced relief.

41.      A settlement is inevitably a function of what can be obtained.  The enhanced terms of the present settlement were the result of the significant increase in bargaining leverage that class counsel obtained when 36 Attorneys General objected to the initial settlement.  Armed with this support, plaintiff's attorneys were able to obtain concessions from Sharper Image which, in their judgment, were not possible at the time of the original settlement.

<u>Fee Negotiations</u>

42.      Concerns about collusion are heightened when the parties fail to separate the negotiation of the merits relief, on the one hand, from the negotiation of the attorneys' fee, on the other.  If these two matters are negotiated at the same time, there is a possibility that the parties will trade off a greater fee for class counsel against a lower recovery for the class.

43.      In the present case the parties scrupulously avoided discussing counsel fees until after they reached agreement in principle on the merits.  Their commendable decision to separate the fee and merits negotiations is a reason for confidence in the integrity of the negotiations.

<u>Fee Amount</u>

44.      Had this been a collusive settlement, one would expect to observe a generous attorneys' fee for relatively little work.  In fact the opposite is the case.  As discussed below, the requested fee is reasonable.

## THE MERCHANDISE CREDITS AND OTHER CLASS RELIEF ARE WELL-DESIGNED AND PROVIDE GENUINE VALUE TO THE CLASS

45.     Most consumer class action settlements include a procedure under which the class member must file a claim with a settlement administrator who then sends the relevant relief to those whose claims are determined to be valid.  Any claims process can significantly reduce the claiming rate.

46.     An important benefit of this settlement is the fact that a majority class members do not have to fill out a claim or do anything at all to receive the benefit of the settlement.  If they are in Sharper Image's database, they will receive a notice informing them of the relief to which they are entitled and providing them with codes that can be used to redeem the Merchandise Credits and obtain the free OzoneGuards.

47.     Attributes of an excellent consumer settlement include the following:

(a)     the credits are for an amount of money that would make it worthwhile for class members to redeem them;

(b)     the items covered by the credits are ones that the class members would value;

(c)     the credits can be used for a reasonably high percentage of the value of the products in question;

(d)     class members are likely to use the credits relatively quickly and/or the credits are valid for a relatively long time period;

(e)     the process for redeeming the credits is reasonably simple and convenient;

(f)     the credits can be aggregated with one another and are available together with other promotions or discounts; and

(g)     the credits are reasonably transferable.

### Face Value

48.     The face value amount of Merchandise Credits ($19.00) is sufficient to make it worthwhile to use them even if a class member is entitled to receive only one credit.

49.     Class members have the right to obtain multiple Merchandise Credits if they purchased more than one Ionic Breeze® product for more than $100 during the class period. Because the Merchandise Credits can be aggregated – a feature I will discuss below – class members have a strong incentive to combine Merchandise Credits to purchase products.

<u>Items Available for Purchase</u>

50.     Items available for purchase from Sharper Image include personal grooming products, kitchen utensils and storage systems, sound systems and components, luggage, golf-related items, general sports equipment, toys and recreational items, timepieces, picture and video displays, kitchen and bath accessories, exercise and weight loss equipment, home cleaning products, lighting products, space heaters and more.  These items include many that would either be useful to class members themselves or suitable as gifts to others.

51.     In the usual certificate settlement, class members are required to purchase the defendant's products only.  The Third Amended Settlement provides additional value in that holders can use Merchandise Credits to purchase *any* item available for sale from Sharper Image whether or not it is branded by Sharper Image.

<u>Percentage of Product Value</u>

52.     I am informed that as of July 23, 2007 there were approximately 230 products available for less than $19 – the value of one Merchandise Credit – and approximately 540 products available for less than $38.  It is evident that the Merchandise Credits represent a significant proportion of the cost of many Sharper Image products, especially considering they may be used to purchase products that are already on sale.

53.     In addition, because the Merchandise Credits can be aggregated and freely transferred, class members and others will be able to combine them to obtain a substantial discount off the price of even larger-ticket items, or even acquire such items for Merchandise Credits alone.

<u>Time Period for Redemption</u>

54.     Class members have until two years after final approval of the settlement to redeem their Merchandise Credits, which is a relatively generous redemption period.  Because the credits can be used immediately, moreover, there is no delay of validity that could result in the settlement codes being lost or misplaced.

<u>Process of Redemption</u>

55.     The redemption process is simple and convenient.  Class members can redeem Merchandise Credits or obtain free OzoneGuards at any Sharper Image store, over the Company's Web Site, or over the telephone with Sharper Image's telephone order desk.

<u>Aggregation</u>

56.     In many consumer settlements the class member must actually pay something – often a substantial amount – for the items in question, using the settlement relief only to get a discount off the retail price.  The payment requirement is maintained by denying or limiting the class members' ability to aggregate or "stack" certificates for any particular item.  Such settlements are often upheld even though objectors may challenge them on the ground that they are essentially a marketing program.

57.     No such objections can be lodged against this settlement.  The Merchandise Credits can be aggregated virtually without limit (the sole exception is that a transferee may not redeem more than a total of five transferred credits).  This settlement is not a marketing program for Sharper Image.

<u>Transferability</u>

58.     Another excellent feature of the Third Amended Settlement is that, unlike many consumer settlements which have been upheld by the courts, the Merchandise Credits may be transferred without limitation.  Transfers may be conveniently made over the settlement Web Site or by means of a form provided to class members.

59.     The free transferability of these credits confers two significant benefits:

18

     (a)     In the event that a class member does not want to purchase anything from Sharper Image he or she can simply transfer credits to someone else – a family member, co-worker or friend – who does want to purchase something.

     (b)     Class members who do not wish to use or give away the credits can list them for sale – for example on eBay or Craigslist.  Entrepreneurs could also set themselves up as dealers in these items.

## THE REQUESTED AWARD FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

60.     The Third Amended Settlement contemplates that if approved by this Court Sharper Image will pay $1,875,000 to cover the reasonable attorneys' fees and expenses of class counsel.  Class attorneys have incurred expenses of $220,944.76.  Thus the total fee request is $1,654,055.24.

61.     It is appropriate to base the calculation of a reasonable fee on the lodestar method.  Under the lodestar method the court multiplies the reasonable attorney hours by the reasonable hourly rate to compute a "lodestar," which is then adjusted by a "multiplier" to account for other factors, most importantly the risk of the litigation.

62.     Attorneys for the class have incurred a lodestar of $1,159,883 through June 2007, representing 3,310.45 hours of attorney time (this underestimates the true extent of the attorneys' time because they have continued to litigate the case since June and will expend additional hours up to and beyond the final fairness hearing).

63.     The requested attorneys' fee of $1,654,055 represents a multiplier of 1.4 over the lodestar amount.  This figure is easily within the range of reason and in fact is relatively low.

64.     Professor Theodore Eisenberg of Cornell University and I examined data on fee awards in 1,120 common fund cases compiled in the March-April 2003 edition of *Class Action Reports* (CAR).  Theodore Eisenberg and Geoffrey Miller, *Attorneys' Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 27 (2004).

65.     The reasonableness of a 1.4 multiplier can be demonstrated by data from the CAR study described above.  Specifically, a 1.4 multiplier can be deemed reasonable where the recovery for the class is approximately $2 million.  (*See* Table 1.)

**Table 1: Lodestar Multipliers by Recovery Range, CAR Data[1]**

| Recovery Range ($ millions) | No. of Cases | Multiplier |
|---|---|---|
| > $100 | 64 | 4.50 |
| $75 < $100 | 26 | 3.93 |
| $50 < $75 | 37 | 2.75 |
| $30 < $50 | 67 | 2.32 |
| $20 < $30 | 65 | 1.90 |
| $10 < $20 | 153 | 1.97 |
| $5 < $10 | 217 | 1.89 |
| $3 < $5 | 142 | 1.89 |
| $2 < $3 | 98 | 1.63 |
| $1 < $2 | 123 | 1.25 |
| < $1 | 128 | 1.10 |
| All Cases | 1,120 | 3.89 |

66.     Here, I am informed that a maximum of approximately 5.8 million Merchandise Credits will be available as a result of this settlement.  The Merchandise Credits therefore have a face value of approximately $110.2 million.  Applying the redemption rate of 23% estimated by Professor Ravi Dhar, the value of the Merchandise Credits can be estimated at approximately $25.35 million.  However, even at a 10% redemption rate, the Merchandise Credits would have an estimated value of $11.0 million.  Moreover, this settlement generates other items of relief in addition to Merchandise Credits.  The OzoneGuard, advertising modifications, and testing requirements are non-monetary aspects of the settlement directed at addressing the allegations in the complaint.  While it may be impossible to quantify these items, they clearly confer significant benefits.  In light of the foregoing, it is clear that the requested 1.4 multiplier is reasonable, because the value conferred upon the class is far greater than $2 million.

---

[1] Source: derived from Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Rep. 169 (2003).

67.     It is also significant that the parties scrupulously avoided negotiating over the fee until they had reached an agreement in principle on the merits.  As a result of this procedure, there was no chance that the parties would trade off a higher attorneys' fee for a lower class recovery.  When the parties did turn to fees, Sharper Image had a strong self-interest in negotiating for a low award since every dollar of fees will paid out of its own pocket.  The adversarial process of fee negotiations, attested to by counsel for both parties, provides additional assurance as to the reasonableness of the fee.

**THE CLASS IS SUITABLE FOR CERTIFICATION FOR SETTLEMENT PURPOSES**

68.     There is no doubt that this class is so numerous that joinder of all members is impracticable and that there are questions of law or fact common to the class.  The claims of the representative plaintiffs are typical of the class, since each of them purchased an Ionic Breeze® air purifier during the class period.  Although neither representative plaintiff is versed in the intricacies of the law, both generally understood their duties as class representative.  Figueroa provides independent accounting services to one of the firms representing the class (Haggard firm) and to several partners in that firm, but has no prior relationship with the Lightfoot firm, and does no work for Robert Parks, the lawyer at the Haggard firm actively involved in this case.

69.     I have reviewed the resumes and work product of counsel and believe the class was ably represented.  As discussed above, I find no evidence of "reverse auction" or collusion.

70.     Because this is a settlement class, issues of manageability at trial are not pertinent because the proposition is that there will be no trial.  Similarly, in this settlement context, the issue of the superiority of the forum is whether a settlement in this action is superior to a case still being litigated in California.  Given the strong policies favoring settlement, it is not difficult to conclude that the class is best served by concentrating the litigation in this forum.

Conclusion

It is my opinion that the settlement was the product of bona fide, adversarial negotiations and was not the product of collusion. The settlement relief is well-designed and provides real and significant value to the class.  The requested attorneys' fees are clearly reasonable.  The case is

suitable for certification as a settlement class. All of these features bear positively on the assessment of the fairness, adequacy and reasonableness of the proposed settlement.

FURTHER AFFIANT SAYETH NOT.

Geoffrey P. Miller

SUBSCRIBED and SWORN to me on the ___ day of August, 2007.

Printed Name: _Gail Thomas_

Notary Public, State of New York

My Commission Expires: _Sept 23rd 2010_

Gail Thomas
Notary Public State of New York
No. 010N5068334
Qualified in Richmond County
Commission Expires September 23, 2010

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of August, I electronically filed the foregoing

## AFFIDAVIT OF PROFESSOR GEOFFREY P. MILLER

with the Clerk of Court pursuant to the Administrative Procedures for Electronic Filing in Civil and Criminal Cases of this Court by using the CM/ECF system which will send notice of electronic filing and complete service of the foregoing as required by F.R.Civ.P. 5 to the following:

| | |
|---|---|
| Robert L. Parks, Esquire<br>Haggard, Parks, Haggard & Lewis, P.A.,<br>330 Alhambra Circle<br>Coral Gables, Florida 33130<br>Co-Counsel for Plaintiff | Stephen Rowe, Esquire<br>Lightfoot, Franklin & White, LLC<br>The Clark Building<br>400 North 20th Street<br>Birmingham, Alabama 35203<br>Co-Counsel for Plaintiff |
| Guy Lewis<br>Michael Tein<br>David B. Rosemberg<br>Lewis Tein PL<br>The Offices at Cocowalk<br>3059 Grand Avenue, Suite 340<br>Coconut Grove, Florida 33133<br><br>Local Counsel for California Class Counsel | Daniel E. Birkhaeuser<br>Jennifer S. Rosenberg<br>Bramson Plutzik Mahler & Birkhaeuser LLP<br>2125 Oak Grove Road<br>Suite 120<br>Walnut Creek, CA 94598<br>925-945-0200<br><br>Counsel for Intervenor John Potter |
| Russell Scott Kent<br>Office of the Attorney General<br>Antitrust Division<br>PL-01, The Capitol<br>Tallahassee, FL 32399-1050<br>850-414-3854<br><br>Amicus | Brant Harrell<br>Attorney General's Office<br>425 Fifth Avenue N<br>2nd Floor CHB<br>Nashville, TN 37243<br>615-532-9299<br><br>Amicus |
| Jeffrey M. Feltman<br>Attorney General's Office<br>1001 E Main Street<br>Carbondale, IL 62901<br>618-529-6400<br>Amicus | Stephanie N. Guyon<br>Attorney General's Office<br>Len B Jordan Building Lower Level<br>PO Box 83720<br>Boise, ID 83720-0010<br>208-334-4135 |

| | Amicus |
|---|---|
| Wendy J. Weinberg<br>Attorney General's Office<br>441 4th Street NW<br>Suite 450-N<br>Washington, DC 20001<br>202-727-2870<br><br>Amicus | |

/s/      T. Todd Pittenger

**TERRY C. YOUNG**
Florida Bar No. 222364
**JAMES S. TOSCANO**
Florida Bar No. 899909
**T. TODD PITTENGER**
Florida Bar No.  0768936
Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
215 North Eola Drive
Orlando, Florida 32802
Telephone:  (407) 843-4600
Facsimile:  (407) 843-4444

**DAVID L. ARONOFF, ESQUIRE**
**GAYLE I. JENKINS, ESQUIRE**
Thelen Reid Brown Raysman & Steiner LLP
333 S. Hope Street, 29th Floor
Los Angeles, California 90071
Telephone:     (213) 576-8044
Facsimile:     (213) 576-8080

**PATRICK M. RYAN, ESQUIRE**
Thelen Reid Brown Raysman & Steiner  LLP
101 Second Street, Suite 1800
San Francisco, CA 94105-3601
Telephone:     (415) 371-1200
Facsimile:     (415) 371-1211

Attorneys for Sharper Image Corporation

C:\Documents and Settings\srostamian\Desktop\POS.doc