UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 05-21251-CIV-ALTONAGA/Bandstra

MANUEL FIGUEROA, and DIXIE M.
GARNER, individually and on behalf of
those similarly situated,

        Plaintiffs,

v.

SHARPER IMAGE CORP., a Delaware
corporation,

        Defendant.

_____/

## ORDER ON PARTIES' REQUEST FOR FINAL APPROVAL
## OF PROPOSED SETTLEMENT

This class action lawsuit, similar to other suits previously filed and still pending against Defendant, concerns claims by Plaintiffs, Manuel Figueroa ("Figueroa") and Dixie M. Garner ("Garner"), that (1) Defendant, Sharper Image Corp. ("Sharper Image"), falsely advertised that the Ionic Breeze® air purifier[1] cleans and purifies the air, and (2) the Ionic Breeze® is harmful because it emits ozone in excess of 50 parts per billion ("ppb"). The case is now before the Court on the parties' request that the Court grant final approval to the Third Amended Settlement Agreement, following preliminary approval given to an earlier version of the Agreement on January 2007, and a final fairness hearing held on August 16 and 17, 2007. The essence of the current proposed settlement is to give class members $19 coupons, or merchandise credits, for use at Sharper Image

_____

[1] Several models of Ionic Breeze® air purifiers are included within the scope of the asserted claims.

Case No. 05-21251-Civ-Altonaga/Bandstra

retail stores, an OzoneGuard to protect against ozone emission,[2] injunctive remedies, and to award

Class Counsel close to $2 million in fees and costs.  The Court has carefully considered the parties'

voluminous written submissions, the papers filed by several objectors and *Amicus Curiae*,[3] the oral

arguments presented, the entire record in this case, and applicable law.

## I.  BACKGROUND

### A.  *Procedural History Prior to Proposed Settlement of the Case*

On May 6, 2005, Figueroa,[4] individually and on behalf of all consumers in the United States

who purchased "Ionic Breeze®" or other ionizing air purifiers from Sharper Image, filed the present

suit.  The original Complaint asserted claims for breach of contract, breach of warranty, money had

and received, and unjust enrichment, based on Defendant's allegedly unlawful conduct of marketing

and selling ionizing air purifiers that do not remove impurities from the air and that fail to perform

as advertised and sold.  Furthermore, the Complaint alleged the ionizing air purifiers exposed

consumers to hazardous levels of ozone.

On July 5, 2005, Sharper Image filed a Motion to Stay, Abate, Dismiss or Transfer [D.E. 14]

the case on the ground that the lawsuit was a "copy cat" of several cases pending in California and

another case pending in Florida.  Before responding to the Motion to Stay, Figueroa filed his Motion

---

[2] "[T]he primary financial consideration under the settlement agreement is the Merchandise Credit, not the OzoneGuard."  (*Sharper Image's Omnibus Resp. to All Objections* [D.E. 384] at 72).

[3] The objectors who have filed briefs include Constance Bilek [D.E. 278]; La Sarmiento [D.E. 306]; Nilda Nartates [D.E. 282]; Seshadri Raju [D.E. 281]; *Amicus Curiae* Attorneys General [D.E. 300, 340 & 413]; Alicia Bryant [D.E. 303, 331, & 345]; Stephen Friedberg [D.E. 311]; and John Potter [D.E. 317, 326 & 368].

[4] Garner was added as an additional class representative, at the request of Figueroa and Sharper Image, to address some concerns expressed by Sharper Image over the adequacy of Figueroa as a class representative.  (*See Joint Mot.* [D.E. 210]; *Order of Jan. 18, 2007* [D.E. 223]).

Case No. 05-21251-Civ-Altonaga/Bandstra

to Amend Class Action Complaint, seeking to add as a defendant Zenion Industries, Inc. ("Zenion"), the inventor of the ionizing air purifiers at issue. As a result, the Motion to Stay was denied as moot, and Plaintiff was allowed leave to amend.

An Amended Class Action Complaint filed on August 5, 2005 added Zenion as a party, and stated the same claims previously raised, while adding a conspiracy claim and a federal law claim pursuant to the Magnuson-Moss Federal Warranty Act, 15 U.S.C. §§ 2301, *et seq.*.[5]   Zenion responded to the Amended Complaint by seeking a dismissal under Fed. R. Civ. P. 12(b)(6), for failure to state a claim, and under Fed. R. Civ. P. 12(b)(2), for lack of jurisdiction. In its Motion, Zenion also stated its addition to the suit "is nothing more than a thinly disguised attempt to differentiate this action from the lawsuits pending in California in deference to which co-defendant Sharper Image . . . sought an Order of Stay." (*Mot. and Mem. of Law* [D.E. 37] at 1).[6]

Sharper Image responded to the Amended Complaint by renewing its Motion to Stay, Abate, Dismiss or Transfer [D.E. 39]. In the Renewed Motion to Stay, Sharper Image argued: (1) the addition of Zenion did not distinguish this case from the consolidated actions that had been proceeding in California state court for over a year; (2) the Court lacked jurisdiction; and (3) no claims were stated against, Sharper Image's licensor, Zenion. (*See id.* at 18).

---

[5] Sharper Image moved for a judgment on the pleadings [D.E. 111] as to the Magnuson-Moss Warranty Act claim on the basis that Plaintiff had failed to satisfy the explicit statutory requirement that one hundred plaintiffs be named in the complaint for a class action to be cognizable. Upon Plaintiff's concession of error, the motion for judgment on the pleadings was granted by Order dated May 30, 2006. [D.E. 121].

[6] The other lawsuits included *Robertson v. Sharper Image Corp.*, Cal. Super. Ct., San Francisco County, Case No. CGC 04-434230; *Potter v. Sharper Image Corp.*, Cal. Super. Ct., San Francisco County, Case No. CGC-0346350; *Cox v. Sharper Image Corp.*, Cal. Super. Ct., San Francisco County, Case No. CGC-04-429331 (because the cases were consolidated, they are collectively referred to as the "California actions"); and *Bryant v. Sharper Image Corp.*, Fla. 4th Jud. Cir. Ct., Duval County, Case No. 16-2003-CA0006272XXX CV-C ("Florida state court action").

Case No. 05-21251-Civ-Altonaga/Bandstra

Because Plaintiff and Sharper Image requested time to conduct jurisdictional discovery to address Zenion's Motion to Dismiss, a proposed hearing on the Motion to Dismiss was postponed, and the Motion was administratively terminated.  The Motion to Stay was, however, addressed at a hearing held on November 16, 2005, and was denied.  The undersigned explained in her Order of December 13, 2005 [D.E. 61] that parallelism between this and the other pending state actions did not exist because "there exist both a party and causes of action in the present case that are not present in the pending state court actions."  (*Order of Dec. 13, 2005* at 4).  The related request for a transfer was similarly denied.

Sharper Image filed its Answer to the Amended Complaint on March 3, 2006 [D.E. 78], raising eighteen affirmative defenses.  On May 11, 2006, Zenion filed a second Motion to Dismiss [D.E. 94] on the ground previously raised, following the jurisdictional discovery taken.  On July 3, 2006, Plaintiffs filed their Motion for Class Certification under seal.  Following Sharper Image's Motion to Set a Briefing Schedule [D.E. 136], the parties were given a briefing schedule, establishing, *inter alia*, deadlines for class action expert discovery[7] and the filing and briefing of Defendant's opposition to Plaintiffs' Motion for Class Certification, which would be due on September 15, 2006.  (*See July 12, 2006 Order* [D.E. 139]).  The hearing on the Motion for Class Certification was fixed by that Order to take place on November 2, 2006.  The Opposition Memorandum was filed on October 2, 2006 [D.E. 172], also under seal.

---

[7] By Order dated October 12, 2005 [D.E. 46], the undersigned had limited discovery to issues of class certification and jurisdiction.  The Order also required that Plaintiffs' Motion for Class Certification be filed by July 1, 2006, a date that was extended to July 3, 2006.  (*See Plaintiff's Uncontested Mot. for Addit. Page Allowance* [D.E. 133] at 1 n.1).

4

Case No. 05-21251-Civ-Altonaga/Bandstra

In the meantime, by Order dated August 11, 2006 [D.E. 148], the undersigned granted Zenion's Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(2), finding the Court lacked personal jurisdiction over Zenion under the Florida long arm statute, and the exercise of jurisdiction over Zenion would not comport with the due process requirements of the Fourteenth Amendment.

On the eve of the class certification hearing, with Zenion no longer in the case, and in the absence of merits discovery having taken place, the parties advised the Court they had reached an agreement on all aspects of the class claims on a nationwide basis, and that what remained to be resolved was the issue of attorney's fees. (*See Nov. 2, 2006 Tel. Hearing*). The parties requested the hearing on class certification be continued and they be given 30 days to present a "complete package" to the Court. (*See id.*). The *ore tenus* motion was granted, and at the later request of Sharper Image [D.E. 193], the minutes of the hearing were removed from the docket and placed under seal. By another set of papers filed under seal, the parties gave the Court a status report, advising they had made significant progress since the November 2 hearing in arriving at a settlement, and requesting the class certification hearing originally scheduled for November 2, 2006 be continued by ten days, from December 1, 2006 to December 11, 2006 [D.E. 203].

On November 27, 2006, court-appointed counsel in a certified national class action set for trial in California, the *Mercedes Robertson v. Sharper Image Corp.* case, notified the Court of the earlier-filed national class action and moved for disclosure of some of the sealed documents filed in this case. (*See Notice of Certified Class Action* [D.E. 196]). In the Notice, counsel for Mercedes Robertson also requested notice of future proceedings. (*See id.*). Robertson's counsel stated he had "reason to believe that the parties here are attempting to settle the claims belonging to the California Actions class, without the knowledge or consent of the class representatives or Class Counsel.

Case No. 05-21251-Civ-Altonaga/Bandstra

Counsel for the parties to this lawsuit have refused all informal efforts to answer this question." (*Id.* at 2).

On December 13, 2006, the undersigned held a hearing, and, over objection of the parties, required Sharper Image to disclose certain documents. (*See Dec. 13, 2006 Order* [D.E. 208]).  At that hearing, the undersigned expressed her concern over the parties' practice of filing documents under seal in a purported class action lawsuit.  The undersigned also commented on the absence of any renewed request by Sharper Image to stay this case in favor of the earlier-filed California actions after Zenion was dismissed from this case.  (*See Dec. 13, 2006 Hearing Tr.* [D.E. 209] at 21).

Counsel for Sharper Image explained its position that "[t]here are competing class actions that take place and there are instances where one case is settled over the other case, and that's all that's really going on here."  (*Id.* at 23).  At the conclusion of the hearing, the parties agreed the hearing on the motion for class certification would be held on February 5, 2007.  (*See Dec. 13, 2006 Order* [D.E. 208]).

Before the hearing could be held, on January 16, 2007, the parties filed a Joint Motion for Preliminary Approval of Settlement, Conditional Certification of the Settlement Class, etc. [D.E. 212], attaching to the Motion the parties' Settlement Agreement and a proposed Second Amended Complaint.  The essence of this first Settlement Agreement was to provide to class members, limit one per household, a $19 merchandise credit, valid for one year, for use at Sharper Image retail stores on Sharper Image branded products.  The first Agreement also provided class members the ability to purchase (during a six-month period of time) an OzoneGuard attachment, for Ionic Breeze® floor models only, for $7.  Sharper Image also agreed to make modifications with respect to its advertisements of the Ionic Breeze®, for example, to not state that the Ionic Breeze® is a medical

6

Case No. 05-21251-Civ-Altonaga/Bandstra

device and to remove the British Allergy Foundation and the Asthma and Allergy Foundation of America seals from its advertising.

The Joint Motion also explained that the present class action, while presenting factual and legal claims parallel to the California actions and the Florida state court action, was significantly broader than those actions in terms of the size of the class; and the scope of the relief, the breadth of the law implicated, and the scope of the legal claims sought to be amended. (*See id.* at 8). While the operative pleading, the Amended Complaint, stated claims for breach of contract, breach of express warranty, breach of implied warranty, unjust enrichment, money had and received, and conspiracy, the proposed Second Amended Complaint added express claims under the various state consumer protection statutes, including statutory claims under the laws of every state in the United States for false advertising and unfair competition. (*See id.* at 10). In contrast, the California actions were limited to claims under California state law. (*See id.*). The Joint Motion also sought a stay and preliminary injunction, enjoining the competing actions in order to facilitate an efficient and expeditious settlement and approval process, and to preserve the Court's jurisdiction to adjudicate the settlement.

Several objectors sought leave to intervene to object to the proposed Settlement Agreement, among them Mercedes Robertson ("Robertson") and Alicia Bryant ("Bryant"). At the preliminary approval hearing of January 23, 2007, Plaintiffs' counsel represented "to the Court as an officer of the Court that this settlement is the best settlement that can be obtained for this class with this company, and that's the simple fact of the matter and that's why it ought to be approved." (*Jan. 23, 2007 Hearing Tr.* [D.E. 247] at 68). The parties represented that Sharper Image was in a precarious financial position.

7

Case No. 05-21251-Civ-Altonaga/Bandstra

Following the January 23 hearing, the undersigned denied without prejudice the Joint Motion for Preliminary Approval of Settlement, and granted the parties' request to file a Second Amended Complaint.  (*See Jan. 24, 2007 Order* [D.E. 238]).  On January 24, 2007, the parties submitted a Renewed Joint Motion for Preliminary Approval of Settlement, etc. [D.E. 240], including an Amended Settlement Agreement that addressed some of the undersigned's concerns with the first Settlement Agreement, expressed at the January 23, 2007 hearing.  Specifically, the parties clarified language concerning an earlier release of claims for personal injury, and removed a non-disparagement provision.  By Order dated January 25, 2007 [D.E. 245], the Court preliminarily approved the Amended Settlement Agreement, certified a class solely for purposes of settlement, appointed Figueroa and Garner as class representatives, approved the class notice, enjoined the *Robertson*, *Potter*, *Cox*, and *Bryant* proceedings pending against Sharper Image, conditionally appointed settlement Class Counsel, and preliminarily found the Amended Settlement Agreement to be fair, adequate, and reasonable.  The date for the final fairness hearing was set for August 16, 2007.

In their initial Joint Motion for Preliminary Approval, with respect to the standards governing preliminary approval, the parties stated as follows:

> Preliminary approval is the first of a two-step process for approval of a proposed class action settlement under Rule 23 of the Federal Rules of Civil Procedure.  In this first step, the court simply determines whether the proposed settlement falls within the range of possible approval and whether it is reasonable to issue notification to settlement class members of the settlement's terms.  In the second step, after notice to the class and an opportunity for absent settlement class members to object or otherwise be heard, the court will determine whether to grant final approval of the settlement as fair and reasonable under Federal Rule of Civil Procedure 23.  (*See* Alba Conte & Herbert B. Newberg, *Newberg on Class Actions*, § 11.25 (4th ed. 2002), *citing Manual for Complex Litigation (Third)* § 30.41 (1995).)

> Preliminary approval of a proposed class action settlement does not involve

8

a determination of the merits of the proposed settlement or affect the substantive rights of any class member. (*Barabin v. Aramark Corp.*, 210 F.R.D. 152, 157 (E.D. Pa. 2002) ["plaintiffs have no obligation to 'prove' their case at this point and the court's resolution of the class motion is limited to ascertaining whether the requirements of Rule 23(a) and (b) are met."], *citing In re Ikon Office Solutions, Inc.*, 191 F.R.D. 457, 462 (E.D. Pa. 2000).) Rather, the purpose of preliminary approval is solely to communicate the proposed settlement to the class, review and approve the proposed form of notice to the class, and to authorize the manner and form of dissemination of the notice. (*Newberg on Class Actions* at § 11.25 ["If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies . . . and appears to fall within the range of possible approval, the court should direct that" notice issue and should schedule a final approval hearing. (citation omitted.)].)

(*Joint Mot. for Prelim. Approval of Settlement* at 16-17). By granting preliminary approval, the undersigned merely confirmed the proposed settlement fell within the range of possible approval, and communicated that proposal to the class.

### B. Plaintiffs' Allegations

Plaintiffs submitted their Second Amended Class Action Complaint ("SAC") as an exhibit to the Affidavit of Stephen J. Rowe, filed in support of the parties' Joint Motion for Preliminary Approval of Settlement and Other Relief [D.E. 214]. The SAC is filed by Plaintiffs, Figueroa and Garner, individually and as private attorneys general on behalf of all persons who, after April 1, 1999, purchased in or from a location in the United States one of Sharper Image's Ionic Breeze® Silent Air Purifiers, identified by their several model numbers and names. Plaintiffs allege that in marketing the Ionic Breeze®, Sharper Image either explicitly or implicitly made representations to consumers that the product was effective; efficiently cleaned and purified air; eliminated and reduced pollen, animal dander, and other contaminants from the air; was effective in providing germicidal protection by killing bacteria, viruses, and mold; was suitable to clean the air in a 500 square room and in rooms larger than 7 by 7 feet; provided relief from asthma and allergies; was superior to High Efficiency

Case No. 05-21251-Civ-Altonaga/Bandstra

Particular Arresting (HEPA) air purifiers; and produced beneficial levels of ozone. The SAC also includes allegations that the Ionic Breeze® does not perform as represented and exposes consumers to hazardous levels of ozone.

In addition, Plaintiffs allege the following:

• Sharper Image's representations were made negligently, knowingly, recklessly, willfully, and/or intentionally, and are unfair, misleading, deceptive, untrue, fraudulent, and violate various common law and statutory provisions;

• in marketing and selling the product, Sharper Image negligently, knowingly, recklessly, willfully, or intentionally concealed, failed to disclose, or hid from consumers and the general public that the product produces harmful levels of ozone in excess of 50 ppb, in excess of UL 867 standard for consumer products, and in excess of U.S. safety requirements; and

• the product is ineffective as an air purifier, as evidenced by its low CADR[8] rating.

Plaintiffs allege they relied on the misrepresentations or concealments in purchasing the Ionic Breeze® and suffered damage as a result.

The proposed class is defined as consisting of all persons who, after April 1, 1999, purchased in or from a location in the United States an Ionic Breeze®. Plaintiffs assert nationwide certification would not require multiple subclasses based on divergent laws because the legal standards governing Sharper Image's unlawful conduct are consistent across the United States. According to Plaintiffs, express warranties in the sale of goods are created by section 2-313 of the Uniform Commercial Code

---

[8] CADR, or Clean Air Delivery Rate, is a measure of air cleaner performance. *See Sharper Image Corp. v. Consumers Union of U.S., Inc.*, 2004 WL 2554451, at * 7 (N.D. Ca. 2004). CADR has been adopted by the American National Standards Institute ("ANSI") and the Association of Home Appliance Manufacturers ("AHAM").

Case No. 05-21251-Civ-Altonaga/Bandstra

("UCC"), and its provisions are virtually identical across the various states' laws.  The "landscape of

implied warranties" (*SAC* at 13) is similarly dominated by the UCC in that section 2-314 has been

adopted in virtually all U.S. jurisdictions.  Moreover, Plaintiffs contend every jurisdiction in the

United States recognizes the theories of unjust enrichment and money had and received.

    Count I states a claim for breach of contract.  Plaintiffs and members of the class are alleged

to have entered into binding contracts with Sharper Image for the purchase of a product that would

remove impurities from the air.  Contrary to the terms of the contract, the products allegedly do not

remove impurities from the air or perform as advertised.  As a proximate result of the breach,

Plaintiffs allege they have suffered damages in that they each paid hundreds of dollars for products

that do not work.

    Count II states a claim for breach of express warranty.  Plaintiffs allege Sharper Image

expressly warranted the Ionic Breeze® performed in accordance with the representations

summarized, including the core representation that the product effectively and safely removed

impurities from the air.  Plaintiffs allege they relied on those representations, and Sharper Image

breached the express warranty by providing a product that did not and could not perform as

warranted and advertised.  The warranty failed its essential purpose, and as a result, Plaintiffs

allegedly suffered damages.

    Count III states a claim for breach of implied warranty.  Plaintiffs allege Sharper Image

impliedly warranted the product (and its technology) was merchantable and fit for the particular

purpose for which it was advertised, namely, to remove impurities from the air.  Plaintiffs allegedly

relied on the skill and judgment of Sharper Image, and Sharper Image breached the implied warranty

Case No. 05-21251-Civ-Altonaga/Bandstra

by providing a product that did not and could not perform as warranted and advertised.  Plaintiffs allege as a result of the breach they were damaged.

Count IV states a claim for unjust enrichment.  Plaintiffs allege they bestowed a benefit on Sharper Image to which Sharper Image was not entitled, namely the payment of hundreds of millions of dollars for improperly licensed, labeled, marketed and sold products and technology. "Equity and good conscience require that Sharper Image disgorge the proceeds of the sales into constructive trust with the resulting restitution to Plaintiffs and the Class." (*SAC* at 23).

Count V states a claim for money had and received.  Because of the collection and retention of funds paid by the consumers, Sharper Image has allegedly received and continues to possess money for the use and benefit of Plaintiffs and members of the class.  Plaintiffs also allege the funds should be disgorged and placed into a constructive trust and paid by way of restitution to Plaintiffs and members of the class.

Count VI states a claim of unfair business practices and false advertising, based upon state statutes.  Plaintiffs allege Sharper Image's conduct in advertising, marketing, distributing, and selling the Ionic Breeze® was fraudulent in that Sharper Image actually misled or engaged in conduct likely to mislead Plaintiffs and class members.  The advertising was allegedly unfair, misleading, deceptive, or untrue.  The several states' consumer protection statutes are specifically identified and alleged. Moreover, Plaintiffs allege "[t]he unfair business practices and false advertising laws of the various states of the United States are not so varied as to render this Action unmanageable." (*SAC* at 27).

Count VII is entitled "Permanent Injunction."  The Count does not state a separate claim, rather, in it Plaintiffs seek the remedy of a permanent injunction directing Sharper Image to cease and desist from manufacturing, marketing, and selling a product that does not perform as advertised; and

Case No. 05-21251-Civ-Altonaga/Bandstra

misstating the performance capabilities of the Ionic Breeze®.  Plaintiffs also seek a declaratory judgment.

Defendant, Sharper Image, has never responded to the SAC.

**C.  *History and Nature of the Parties' Proposed Settlement and its Several Amendments***

Prior to the Order Preliminarily Approving Settlement, the parties had presented to the Court the original Settlement Agreement, which was disapproved, and the Amended Settlement Agreement, which was approved by the Court's Order.  Following entry of the January 25 Order granting preliminary approval, and before the final fairness hearing, the Amended Settlement Agreement was changed several times.

Notably, on June 20, 2007, the Attorneys General of Alaska, Arizona, Arkansas, Connecticut, Florida, Idaho, Illinois, Indiana, Iowa, Maine, Maryland, Michigan, Minnesota, Massachusetts, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, and Wyoming, as well as the District of Columbia, and the Executive Director of the Hawaii Office of Consumer Protection (hereinafter, collectively referred to as "Attorneys General"), filed a Motion for Leave to File Brief *Amicus Curiae* [D.E. 297], and submitted their brief in opposition to the proposed Settlement.[9]  The Attorneys General supplied the Court and counsel a thorough exposition of the critiques surrounding "coupon settlements," that is, settlements under which class members are awarded coupons or merchandise credits rather than cash.

_____

[9] The Attorneys General are statutorily empowered by the United States Congress to receive and review all class action settlements.  *See* Class Action Fairness Act of 2005 (the "CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 United States Code).

Case No. 05-21251-Civ-Altonaga/Bandstra

The Attorneys General advanced the views of law professor Christopher Leslie, who has identified three major problems with coupon settlements: they often do not provide meaningful compensation to class members; they often fail to disgorge ill-gotten gains from the defendant; and they often require class members to do future business with the defendant in order to receive compensation. (*See Brief Amicus Curiae* [D.E. 297] at 6, citing Christopher R. Leslie, *The Need to Study Coupon Settlements in Class Action Litigation*, 18 GEO. J. LEGAL ETHICS 1395, 1396-97 (2005)).

The Attorneys General maintained the Amended Proposed Settlement Agreement did not pass muster under what they maintained is heightened scrutiny of coupon settlements mandated by the Class Action Fairness Act of 2005.  They also asserted that the Amended Proposed Settlement Agreement did not even satisfy what they maintained were the less rigorous requirements of Fed. R. Civ. P. 23(e), that a settlement be fair, reasonable, and adequate.  More about the nature of the Attorneys General's objections *infra*.

Others filed similar objections to the then-operative Amended Settlement Agreement.  On May 8, 2007, John Potter, a member of the certified class in *Potter v. Sharper Image Corp.*, pending in the San Francisco Superior Court, moved to intervene in this action to urge the Court not to grant final approval to the Amended Settlement Agreement at the fairness hearing scheduled for August 16, 2007, and to be allowed to conduct discovery concerning the settlement.  (*See Mot. of John Potter to Intervene* [D.E. 279]).  On June 21, 2007, La Sarmiento, a class member, similarly filed a Motion to Intervene [D.E. 304],[10] and filed a memorandum explaining the several bases for her objections to the Amended Settlement Agreement, in that the $19 coupon failed to meet the "fair,

---

[10] The Motion was denied by Order dated July 2, 2007.  (*See* [D.E. 334]).

14

Case No. 05-21251-Civ-Altonaga/Bandstra

adequate, and reasonable" standard; the option to purchase a retrofit device (the OzoneGuard) did not cure the defects in the settlement; and because the "injunctive relief" was of no benefit to the class. (*See Objections of La Sarmiento* [D.E. 306]). La Sarmiento also challenged the notice provisions of the settlement. (*See id.*).

Alicia Bryant similarly filed her Notice of Objection [D.E. 303] on June 21, 2007. Bryant focused her objections on the failure of the Amended Settlement Agreement to protect consumers from the health hazards posed by Sharper Image air purifiers. Bryant maintained that Sharper Image should not be allowed to sell its air purifiers as is, that is, without OzoneGuards installed prior to sale and without notice of health risks; Sharper Image should be required to mail class members with known addresses and make available to those whose addresses are unknown, OzoneGuards, with warnings and instructions, rather than providing generic merchandise credits; Sharper Image should not be given a 180-day window in which to retain existing marketing and packaging of its air purifiers; and class members should not be required to release Sharper Image from future unknown claims. (*See Objections of Alicia Bryant* at 3-4).

On June 22, 2007, class member Stephen Friedberg filed his Objections to the Proposed Settlement [D.E. 311]. Friedberg objected to the lack of reimbursement offered to class members and objected to $19 coupons that could only be used on Sharper Image branded products, rather than on third-party products. He objected to the limitation of one coupon per household, which did not account for all individuals who may have purchased one or more Ionic Breeze® units. He argued class members should be given the right to return the defective product to the Defendant for a credit of the full purchase price paid, and any settlement should prevent future abusive marketing practices by Defendant.

15

Case No. 05-21251-Civ-Altonaga/Bandstra

Simultaneous to the filing of the foregoing objections, on June 22, 2007, the parties filed their Joint Motion to Amend Preliminary Approval Order (DE 245 and DE 249) to Incorporate Second Amended Settlement Agreement With Enhanced Terms [D.E. 316]. The new, Proposed Second Amended Settlement Agreement ("Second Agreement") contained the following "enhancements" from the earlier approved Amended Settlement Agreement:

- The $19 merchandise credit was previously limited to one credit per household, regardless of how many units may have been purchased. The merchandise credit was now being made available as follows: (1) one credit would be awarded to class members for each Ionic Breeze® purchased by the class member at a price greater than $100; and (2) only one credit would be awarded per class member for all Ionic Breeze® products purchased at an individual price greater than $0 but less than or equal to $100.

- The concept of "households" was being eliminated entirely.

- Class members previously could not aggregate credits for purchases. In the Second Agreement, class members could aggregate credits for purchases.

- Sharper Image had agreed to reduce the price of the OzoneGuard to its cost price of $7. In the Second Agreement, Sharper Image agreed to provide the OzoneGuard free of charge to class members who purchased a unit without an OzoneGuard and who made a claim. Other consumers could purchase the OzoneGuard for a period of time at the $7 price.

- Sharper Image would ensure it had sufficient OzoneGuards available.

- Sharper Image would expand the number of advertising claims it would refrain from making.

- Procedural mechanisms of the settlement, regarding notice and dates for opting out, were also modified.

16

Case No. 05-21251-Civ-Altonaga/Bandstra

On June 22, 2007, objector Alicia Bryant filed her Application for Award of Attorneys' Fees and Costs [D.E. 312], which is presently before the Court and will be addressed at the conclusion of this Order.  On July 31, 2007, Class Counsel filed an Application for Award of Fees and Expenses [D.E. 358], which is also addressed at the conclusion.

Potter and Bryant filed separate objections to the Joint Motion to Amend Preliminary Approval Order [D.E. 326, 331] on June 29, 2007.  The objectors argued it was unfair the settling parties should have filed an amended settlement agreement on the last date for filing objections, and that they should seek approval from the Court without notice or input from the objectors.[11]  The objectors argued it was improper that the settling parties could simply give notice of the Second Agreement to only those who had opted out.  The objectors maintained the Second Agreement was egregious because those who had expressed a desire to opt out would now be encouraged to opt in and because the Second Agreement was further evidence that the representation of the class was inadequate.

Bryant objected to inclusion of "Third-Party Resellers" in the Second Agreement, and the limitation of only one merchandise credit given to Third-Party Resellers.  Third-Party Resellers, those in the business of selling the IonicBreeze® product, it was maintained, should be given notice of this new restriction.  (*See Opp'n to Joint Mot. to Amend Prelim. Approval Order of Alicia Bryant* [D.E. 331]).  Bryant also objected to the change in definition of the settlement class from purchasers between May 6, 1999 and the execution of the Amended Settlement Agreement, to purchasers between the dates of May 6, 1999 and January 24, 2007.  (*See id.*).

_____

[11] The Order granting preliminary approval provided that "[t]he Court . . . retains jurisdiction to consider all further applications arising out of the Settlement Agreement.  The Court may approve or modify the Settlement Agreement without further notice to Settlement Class Members."  (*Order Preliminarily Approving Settlement, etc.* [D.E. 245] at 9, ¶ 18)

Case No. 05-21251-Civ-Altonaga/Bandstra

On July 9, 2007, the Attorneys General filed their Response Brief [D.E. 340, Ex.2], urging the Court to disapprove the Second Agreement. The Attorneys General pointed out the coupons still could not be transferred, redeemed for cash, or be used to purchase non-Sharper Image branded products, nor could they be used more than one year from the date of the Notice or Final Approval. (*See Attorneys General's Resp. Br.*) The OzoneGuard filters would not be distributed to every consumer who has an Ionic Breeze® that allegedly leaks harmful amounts of ozone, but only to those who file a claim using the "outdated terms" contained in the preliminary notice. (*See id.* at 2). Last, Sharper Image would, by agreement and not because of any injunction, make two modifications to its advertising, that is, it would refrain from representing the Ionic Breeze® removes harmful chemicals found in flooring, paint, and household chemicals, and it would refrain from claiming the product causes a consumer to become immune to allergies.

The Attorneys General continued to object that while the Second Agreement only marginally increased the monetary value of the settlement for a select group of class members, no change was made that would affect the likely utilization rate of the coupons provided by the settlement. (*See id.* at 5 (citing the CAFA, 28 U.S.C. § 1712(e)) ("'[T]he judge should consider . . . the real monetary value and likely utilization rate of the coupons provided by the settlement.'")). Furthermore, the limited notice given to original opt-outs would keep the utilization rate at the same expected low level as under the Amended Settlement Agreement. Lastly, continued restrictions on transfer, product selection, duration and the redemption process negatively affected redemption rates of coupon settlements, including this one. (*See id.* at 6). The lack of disgorgement by Sharper Image of its alleged wrongful gain continued to be an impediment to approval, according to the Attorneys General. (*See id.*).

Case No. 05-21251-Civ-Altonaga/Bandstra

On July 10, 2007, Bryant filed her Memorandum of Law in Opposition to the Renewed Joint Motion to Amend Preliminary Approval Order to Incorporate Second Amended Settlement Agreement With Enhanced Terms [D.E. 345]. Bryant repeated the objections she had previously made concerning insufficiency of notice of the changed terms to all class members, and the change in scope of the settlement class.

By Order dated July 17, 2007, the undersigned granted preliminary approval of the Second Agreement [D.E. 351]. In that Order, the undersigned addressed the notice objections as follows:

> [C]ourts have recognized that when class members have already received notice of the pendency of the action and its proposed settlement, and have declined to opt out, it is not necessary to inform the class members of enhancements to the proposed settlement. *See, e.g., In re The Prudential Ins. Co. of America Sales Practices Litigation*, 962 F. Supp. 450, 473 n.10 (D. N.J. 1997) (noting that where class members have received adequate notice, these same class members need not be informed of the final enhancements to the settlement because the proposed settlement is more valuable with certain amendments, and requiring special notice only to opt-outs to permit them to reevaluate their choices); *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1009, 1012 (N.D. Ill. 2000) (finding notice "complete and adequate" where original notice to all class members satisfied Fed. R. Civ. P. 23(c)(2) and supplemental notice of enhanced settlement terms was limited to those class members who originally opted out).

(*July 17, 2007 Order* at 4-5). After emphasizing that approval of the Second Agreement did not address or resolve questions concerning the final determination of the reasonableness, adequacy, and fairness of the proposed Second Agreement, the undersigned gave her approval.

Nevertheless, less than two weeks later, the parties once again submitted a Joint Motion to Amend Preliminary Approval Order [D.E. 245, 249 and 351] to Incorporate Third Amended Settlement Agreement with Enhanced Terms [D.E. 355]. The Third Amended Settlement Agreement ("Third Agreement") contained the following enhancements:

19

Case No. 05-21251-Civ-Altonaga/Bandstra

- Merchandise credits are fully transferable by class members and by those to whom the credits are transferred.

- Any person receiving merchandise credits via a transfer may aggregate only up to five transferred credits for use.

- Credits expire two years after the date of Notice of Final Approval.

- Credits may now be used to purchase any products sold at Sharper Image, not just the Sharper Image branded products.

- No longer are class members required to log onto the settlement website or submit a claim form in order to receive the credits.  Under the Third Agreement, all class members in the Ionic Breeze® database will receive individual mailings concerning the number of credits and OzoneGuards each is entitled to, and each will be able to transfer the credits on a website.

- Sharper Image agrees to include a link on its website pertaining to the Notice of Final Approval through the Final Claims Bar Date. The Third Agreement is the first proposed settlement to include *cy pres* relief.[12]

---

[12]     The *cy pres* doctrine takes its name from the Norman French expression, "*cy pres comme possible*", which means "as near as possible." *In re Airline Ticket Comm'n Antitrust Litig*, 268 F.3d at 625 (citing *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n*, 84 F.3d 451, 455 n.1 (D.C. Cir. 1996)).  . . .  The *cy pres* doctrine . . . has been used in the class action context . . . to distribute unclaimed funds.  In such a case, the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated.  *In re Airline Ticket Com'n Antitrust Litigation*, 307 F.3d 679, 682 (8th Cir. 2002).

*In re Infant Formula Multidistrict Litig.*, 2005 WL 2211312, at *1 (N.D. Fla. 2005).

Case No. 05-21251-Civ-Altonaga/Bandstra

- Class members in the database who are entitled to one or more free OzoneGuards shall be informed of the number of Guards each is entitled to, without the requirement that a claim be filed.  Those who have to purchase Guards from a store or order one are entitled to free shipping.

- Sharper Image consents to the entry of an injunction to enforce the modifications to its advertising claims.

- Rather than commence advertising modifications 180 days after the effective date of the settlement, Sharper Image agrees to commence advertising modifications 120 days from the effective date.

- The procedural mechanisms of the settlement pertaining to notice are also modified.  A second notice, containing a prominent and conspicuous statement that the notice is not duplicative of prior notices, will be provided so putative class members who attempted to opt out will have the opportunity to rejoin the class, at their option.

- Ninety days after approval, class members in the database will be sent individual mailings, containing a code number and information concerning transferability of their credits.

- The Final Claims Bar Date is further extended to no earlier than December 31, 2008.

By Order dated July 31, 2007 [D.E. 357], the Court required that all objections be received by August 2, 2007.  Needless to say, prior to the final fairness hearing, additional objections were filed to the final version of the parties' settlement agreement, the Third Agreement.

### D. The Nature and Substance of the Objections to the Final Version of the Proposed Settlement

Bryant renewed her earlier objections [D.E. 366] to the settlement terms.  She explained her

Case No. 05-21251-Civ-Altonaga/Bandstra

opposition to the Third-Party Reseller "sub-class," because these are not entitled to receive unlimited credits for the Ionic Breeze® products purchased, even though some units might not have been sold and even though a Reseller might have kept units for personal use. (*See Opp'n to Joint Mot. Amend Approval Order of Alicia Bryant* at 4-6). Resellers who have units in their possession which are not sold until after January 24, 2007 and their post-January 24 purchasers do not receive credits. (*See id.*). The Reseller category of persons is entitled to notice of the creation of this "sub-class" with fewer rights than other purchasers, but in fact received no such notice. (*See id.*).

Potter similarly renewed his objections [D.E. 368][13] on the bases of procedural and substantive flaws in the proposed settlement. As to the procedural inadequacies, Potter now advanced the argument that Sharper Image had engaged in a reverse auction to settle the case. A "reverse auction" is a

> practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant . . . . The ineffectual lawyers are happy to sell out a class they anyway can't do much for in exchange for generous attorneys' fees, and the defendants are happy to pay generous attorneys' fees since all they care about is the bottom line – the sum of the settlement and the attorneys' fees – and not the allocation of money between the two categories of expense.

*Reynolds v. Benefit Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (citations omitted). Potter maintained that Sharper Image played the Florida plaintiffs off against the California actions to reach a poor settlement with weak parties. (*Opp'n to Mot. for Prelim. Approval of Third Settlement Agreement of Potter* [D.E. 368] at 2).

---

[13] Potter also supplied numerous declarations and exhibits in support of his opposition to the Third Agreement (*see* [D.E. 367, 421]), which the undersigned has considered, and some of which are specifically addressed in this Order.

Case No. 05-21251-Civ-Altonaga/Bandstra

Substantively, Potter maintained that even with the newest changes proposed, the settlement is well below the range of recovery that would be fair, adequate, or reasonable. (*See id.* at 4). Potter objected to a $19 coupon on the basis that it is an arbitrary amount, "the result of pure dickering, with the vast majority of the concession coming from the plaintiffs' side." (*Id.* at 4). If ten percent of the 3.2 million-member class redeems the coupons, Sharper Image will not be relinquishing one percent of what it made on sales of the Ionic Breeze® products. (*See id.* at 5).

Potter objected to the continued limits on the transferability and aggregation of the credits. He objected to a settlement that forces consumers back into business with the entity that cheated them in the first place. (*See id.* at 6). He objected to the absence of a minimum payout, *Buchet v. ITT Consumer Fin. Corp.*, 845 F. Supp. 684, 696 (D. Minn. 1994), and Potter asserted the *cy pres* relief in the Third Agreement does not guarantee a minimum payout, because Sharper Image is not agreeing to bring the total payout to 20% with its proposed donation. (*See Opp'n to Mot. for Prelim. Approval of Third Settlement Agreement* at 7).

Potter also objected to the inadequacy of the OzoneGuard provision. (*See id.* at 8). Potter contended that no OzoneGuard is offered for certain models, and the settlement does not address those consumers who may have already spent money purchasing OzoneGuards after Sharper Image started marketing them in 2005. (*See id.* at 9). Those class members who do not receive the personal mailing may not even know of their rights to the OzoneGuards.

Potter maintained Sharper Image no longer makes the advertising statements it has agreed not to make in the future. The injunction provision of the Third Agreement, according to Potter, is "nothing but smoke and mirrors." (*Id.*). Potter also insisted the Third Agreement is procedurally unfair and unreasonable, because class members who are not in the database or who do not register

23

Case No. 05-21251-Civ-Altonaga/Bandstra

on the website will receive nothing, but nevertheless are bound by the release contained in the Agreement. (*See id.* at 10-12).

On August 2, 2007, the parties supplied information concerning how class members had received notice of the proposed settlement. (*See Notice of Joint Rep. of Plaintiffs and Defendant Regarding Notices to Settlement Class Members* [D.E. 371]). Sharper Image affixed a notice of the settlement to its March, 2007 product catalog to achieve "direct mailing" notice. Notices were mailed to approximately 319,737 others who had opted out of receiving the catalogs. Direct mail and published notice were supplemented via a settlement website and a toll free consumer number where callers may leave their names and addresses for claim forms.

Notice by publication was also effectuated. A half-page advertisement appeared on page 18 of the April 8, 2007 issue of a publication known as *USA Weekend*, which has an estimated circulation of 23,442,702. A two-third page advertisement appeared on page 77 of an April 16, 2007 issue of *Sports Illustrated*, which has an average estimated circulation of 3,150,000. The parties estimate 81.5% of the settlement class members were exposed to the notice.

On August 3, 2007, the undersigned again granted preliminary approval of the parties' settlement agreement, in this case, the Third Agreement. (*See Aug. 3, 2007 Order* [D.E. 375]). Thereafter, on August 8, 2007, Friedberg renewed his objections to the Third Agreement (*See Objections of Class Member Stephen Friedberg* [D.E. 383]). As he explained it, with each settlement agreement submitted by Sharper Image (and Friedberg counted a total of five), "the Parties have attempted to mollify the Objectors by adopting some of the Objectors' recommendations in small increments." (*Id.* at 1-2). Nevertheless, Friedberg asserted the latest agreement still failed to provide compensation to class members for losses sustained as a result of Sharper Image's misconduct.

Case No. 05-21251-Civ-Altonaga/Bandstra

According to Friedberg, Sharper Image likely realized margins in excess of $100 million on the sales of the Ionic Breeze® to 2 million consumers, but offers no compensatory payments, merely $19 coupons that may not be redeemed for cash.

To highlight the inadequacy of the present Third Agreement, Friedberg contrasted the settlement reached in a suit against Brookstone for defective air purifiers. In that case, consumers could return the defective air purifiers to Brookstone for store credit equal to the full purchase price of the unit.

On August 10, 2007, the Attorneys General once more submitted their written Notice that reiterated their continued opposition to the proposed settlement notwithstanding the *cy pres* provision added. (*See Notice by the Attorneys General* [D.E. 413]). La Sarmiento, too, filed her Opposition to Third Amended Settlement Agreement. (*See Opp'n to Third Amended Settlement Agreement of La Sarmiento* [D.E. 418]).

La Sarmiento maintained that nothing in the Third Agreement changed the fact that the relief proposed remained unfair, inadequate and unreasonable, particularly given the heightened scrutiny mandated of coupon settlements under the CAFA. La Sarmiento cited to numerous cases in which courts have refused to approve settlements that offer class members little more than the right to purchase more products from the defendant at a discounted price. *See, e.g., Synfuel Tech., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (noting that for many consumers, "the right to receive a discount [or coupon] will be worthless") (quoting Geoffrey P. Miller & Lori S. Singer, *Nonpecuniary Class Action Settlements*, 60 LAW & CONTEMP. PROBS. 97, 108 (1997)); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 221 (D. Me. 2003) ("[A] settlement is not fair where all the cash goes to expenses and lawyers, and the members receive

25

Case No. 05-21251-Civ-Altonaga/Bandstra

only discounts of dubious value.") (footnote omitted); *Buchet v. ITT Consumer Fin. Corp.*, 845 F. Supp. 684, 696 (D. Minn. 1994), *amended by* 858 F. Supp. 944 (proposed coupon settlement rejected after court found that coupon redemption rates in similar cases were so low that the certificates in this case offered no real value to the class). La Sarmiento argued most of the class may be unwilling to make a future purchase from Sharper Image, as well as urged the policy considerations that disfavor "'rewarding the wrongdoing defendant with new sales from the victims of its illegal practices.'" (*Opp'n to Third Amended Settlement Agreement of La Sarmiento* at 4) (quoting *NACA Class Action Guidelines – Revised*, 1590 PLI/Corp. 285 at 313-14 (2007)).

La Sarmiento also argued that particularly where a product is expensive and hazardous, as she maintained the present products to be, the undersigned should follow the lead of other courts in rejecting settlements that offer coupons as the primary form of relief. (*See id.* at 5) (citing *In Re General Motors Corp. Pick-Up Fuel Tank Products Liability Litig.*, 55 F.3d 768, 810 (3d Cir. 1995) (settlement rejected in large part because coupon relief "did not address the safety defect that formed the central basis of the amended complaint filed barely four months before the settlement")).

La Sarmiento maintained the other forms of relief offered, including the OzoneGuard, injunctive relief, and the *cy pres* award, fail to overcome the inadequacy of the coupon settlement. Only a limited number of the Ionic Breeze® machines are compatible with the OzoneGuard, and many class members have already purchased the OzoneGuard (at a purchase price of $40, more than five times the cost incurred by Sharper Image to produce the devices). La Sarmiento asserted the injunctive relief does nothing for class members who have already purchased the Ionic Breeze® from Sharper Image, and, in evaluating the fairness of a proposed settlement, a court should focus on how the agreement compensates class members for their past injuries. (*See id.* at 8). Moreover, La

Case No. 05-21251-Civ-Altonaga/Bandstra

Sarmiento argued the *cy pres* provision, in which Sharper Image does not commit itself to any minimum payout, is a highly contingent event, subject to two specific preconditions that may never come to pass.[14]

La Sarmiento also disapproved of the lack of notice afforded to class members of the Third Agreement.  La Sarmiento maintained the original notice given was inadequate because it merely consisted of a catalogue insert and the publication of a summary notice that did not even mention the retrofit or the proposed attorney's fee to Class Counsel in the amount of $1.875 million.  (*See id.* at 10).  Lastly, La Sarmiento argued that in amending the settlement three times, Class Counsel have been negotiating the settlement with limited leverage.  (*See id.* at 12-13).  The existence of class certification in the California state proceeding gave Sharper Image all the leverage at the negotiating table.  (*See id.* at 13).

Among the documents filed by Potter in support of his opposition to the Third Agreement is a declaration of Stephen Gardner, a consumer advocate, former Assistant Dean of Southern Methodist University Law School, and former Assistant Attorney General of Texas and New York. (*See Decl. of Stephen Gardner* [D.E. 421], Ex. 1).  Mr. Gardner identifies the following deficiencies with the Third Agreement (*see id.* at 2-3), and gives explanations for each of these conclusions: (1) the case is a classic example of a "reverse auction" settlement; (2) the sole purported relief to class members, a coupon requiring the consumer to spend more money at Sharper Image, has little value; (3) the class representative and Class Counsel have repeatedly proven themselves inadequate to

---

[14] For the *cy pres* provision to apply, Sharper Image has to show a "positive net income after taxes, in the aggregate," over its last four fiscal quarters prior to the expiration date of the two-year redemption period.  (*Id.* at 8 (quoting TASA § 8.5)).  Moreover, fewer than 20% of the coupons available to class members must have been redeemed at the expiration date of the redemption period.  (*See id.*).

Case No. 05-21251-Civ-Altonaga/Bandstra

represent the class; (4) there is a distinct subclass who essentially receive no relief at all, third-party consumers who bought the product from other retailers and for whom the only notice given was the "woefully inadequate publication" (*id.* at 9) to which only 34% were exposed to; (5) the case is not superior to other available methods for the fair and efficient adjudication of the controversy; (6) the so-called "injunctive relief" is essentially meaningless because the promises Sharper Image offers to make represent only changes to practices it either never used or already stopped using; and (7) Class Counsel are not entitled to compensation where they originally agreed to "gag" themselves and members of the class by agreeing to a non-disparagement provision, where they originally agreed to a release of all claims, and where any "improvements" to the proposed settlement resulted from the many objections received in the intervening months following the first agreement.

Potter also submitted the affidavit of Morton Lippmann, an environmental scientist and public health researcher, who is presently employed as Director of the Human Exposure and Health Effects Program, Nelson Institute of Environmental Medicine, located at New York University School of Medicine. (*See Aff. of Morton Lippmann* [D.E. 421], Ex. 2, at 2). Dr. Lippmann has written and edited numerous books and publications on environmental and airborne toxicants, air sampling methods, and other matters of human health. (*See id.* at 2). Dr. Lippmann is familiar with the Ionic Breeze® product because he was retained as a consultant and testifying expert for Consumers Union of America in connection with Sharper Image's dispute with *Consumer Reports* magazine concerning the magazine's evaluation of the Ionic Breeze® air cleaners. (*See id.* at 2-3).

Dr. Lippmann explains that CADR, or Clean Air Delivery Rate, is a well-established industry standard, expressing the capacity of an air cleaner to provide particle-free air to displace particle-laden room air. (*See id.* at 3). Dr. Lippmann explains the CADR test protocol is an appropriate

Case No. 05-21251-Civ-Altonaga/Bandstra

means to determine the ability of any household air cleaning product to effectively remove submicrometer sized particles and particles larger than 1 micrometer (i.e., dust) from the ambient air and to determine whether the device provides sufficient clean breathing air for occupants of a room. (*See id.*).  Dr. Lippmann opines that the Ionic Breeze® product does not perform satisfactorily under CADR.  (*See id.* at 6).  The products are not effective air cleaners, and how much energy they consume (low) and how much noise they generate (little), are irrelevant issues with regard to their efficacy as air cleaners.  (*See id.*).

There also exist, however, factors other than CADR to consider in evaluating an air cleaner. (*See id.* at 3).  Andrew Parker, whose declaration was submitted by Sharper Image in support of the proposed settlement, relies on Environmental Protection Agency ("EPA") factors rather than CADR in evaluating the Ionic Breeze® product.  The EPA factors consist of: (1) the percentage of the particles removed as they go through the device, that is efficiency; (2) the amount of air handled by the device; (3) the effective volume of the air to be cleaned; and (4) decrease in performance of the unit if periodic maintenance is not performed on schedule. (*See id.* at 4).  In Dr. Lippmann's opinion, the Ionic Breeze® fails all four of EPA's major criteria for an effective room air cleaner.  (*See id.* at 4).

Dr. Lippmann also reviewed the affidavits of Jeanette Campbell and Jimmy L. Lee, submitted by Sharper Image in support of approval of the settlement, and disagrees with their conclusions and with the testing protocols they utilized.  (*See id.* at 5).  For Dr. Lippmann, the ability of the Ionic Breeze® device to remove about half of the particles that pass through it in a very small volume of air does not demonstrate efficacy in cleaning the air in a room. (*See id.*).  Furthermore, Dr. Lippmann contends the electronic precipitation technology employed in the Ionic Breeze® creates ozone as a

Case No. 05-21251-Civ-Altonaga/Bandstra

byproduct of the ionization process, and any device that emits ozone as part of its operation cannot be considered to improve indoor air quality. (*See id.* at 6).

### E.    Arguments Advanced By the Proponents of the Third Agreement

On the face of this onslaught of opposition, consistent from the first (public) pronouncement that the parties had reached a settlement, Plaintiffs and Sharper Image responded with voluminous submissions and memoranda explaining their views on the fairness, adequacy, and reasonableness of the settlement.  Throughout the parties' written and oral presentations has been the consistent theme that Defendant, Sharper Image, was on the verge of bankruptcy, and that the proposal then under consideration was the best deal that could be arranged.  Below is a detailed summary of the parties' arguments in favor of final approval, focusing on factors delineated in *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984), as guiding a court's determination of whether to approve a proposed class action settlement under Fed. R. Civ. P. 23.

### 1.    Plaintiffs' Likelihood of Succeeding at Trial

Sharper Image maintains the Ionic Breeze® "utilizes revolutionary technology in which air and airborne particles are ionized by wires that are charged with positive voltage, causing the positively charged air and particles to accelerate and 'stick' to negatively charged collector plates, thereby moving and cleaning the air without the need for a fan." (*Def's Omnibus Resp. to All Objections to Final Approval* [D.E. 384] at 1).  The product was developed to give consumers an alternative to fan-based, noisy, and high-energy consuming air purifiers that required expensive filter changes.  After several *Consumer Reports* articles were published criticizing the Ionic Breeze® as not being effective,[15] the already mentioned class action lawsuits, including this one, were filed.

---

[15] The substance of those articles is discussed at greater length *infra*.

30

Case No. 05-21251-Civ-Altonaga/Bandstra

The parties posit that the likelihood of Plaintiffs succeeding at trial on their claims is "very difficult to predict" (*Pls' Mem. in Supp. of Final Approval* [D.E. 408] at 15), because "[a]ny objective assessment reveals that this was a highly contested case." (*Id.*). Plaintiffs' case rests on convincing a jury that the Ionic Breeze® is not capable of effectively cleaning the air and that because of ozone emissions, the air coming out of the device is more harmful than the air going in.

As to the first claim of product ineffectiveness, Plaintiffs' experts, Dr. Richard Shaughnessy and Dr. Jeffrey Siegel, two well-recognized scholars in the indoor air field, relied upon the Clean Air Delivery Rate model by which air purifier effectiveness is measured. According to the Association of Home Appliance Manufacturers ("AHAM"), the CADR performance standard requires an 80% reduction in particle concentrations within 20 minutes in order for an air cleaner to be considered effective for a given room size. (*See Aff. of Richard Shaughnessy* [D.E. 408], Ex. H ¶¶ 7-23). Plaintiffs' commissioned testing showed the Ionic Breeze® units removed less than 34% of contaminants under the AHAM CADR protocol. The Ionic Breeze® could only achieve 80% particle removal in the 20-minute test in a 30 square foot room. (*See id.* at ¶ 20). When applied to the bright-line CADR, the Ionic Breeze® is ineffective at contaminant removal. (*See id.* at ¶ 23).

This conclusion is also supported by testing performed by the Consumers' Union. *See,* CONSUMER REPORTS, *In-depth tests: Sharper Image Ionic Breeze, Honeywell Environizer* (October 2003). Consumers' Union concluded the Ionic Breeze® was "ineffective" and produced "almost no measurable reduction in airborne particles." *Id.*

In contrast, Defendant cites to the EPA's recognition of numerous factors unrelated to CADR that should be considered when assessing the overall performance of air purifiers. This is particularly the case, Sharper Image asserts, given that the Ionic Breeze® is intended to be run over longer

31

Case No. 05-21251-Civ-Altonaga/Bandstra

periods of time than its noisy and energy-consuming counterparts, and thus does not perform well in a 20-minute test. According to the EPA's Indoor Air Facts No. 7, Residential Air Cleaners, important considerations in the effectiveness of indoor air cleaners include noise and maintenance costs. The Ionic Breeze® is quieter and requires less cleaning than fan-driven models, which are judged under the CADR protocol. Furthermore, the Ionic Breeze® "has been confirmed in testing conducted by both Sharper Image and Plaintiffs' experts to remove some level of contaminants." (*Pls' Mem. in Supp. of Final Approval* at 13). Sharper Image points out that Plaintiffs' experts even conceded a 34% reduction of contaminants in a 100 square foot room in 20 minutes.

Moreover, Sharper Image cites to some consumers' level of satisfaction with the product, and positive letters from class members as indicative of satisfaction with the product. Sharper Image asserts science and customer testimony show the Ionic Breeze® neutralizes odor, as advertised; it traps allergens, including pollen and animal dander, as advertised; and it reduces smoke, as advertised. Sharper Image emphasizes it never tied any of its advertising to any particular level of cleaning. With hard science, and the testimony of dozens, if not hundreds, of happy customers, Sharper Image contends the objectors overestimate the strength of Plaintiffs' case against it, while not putting forward any scientific research or testing of their own.

As to the second element of Plaintiffs' claims, that the product is harmful because of the ozone emissions it produces, Plaintiffs' expert testing did not reveal ozone production in excess of the 50 parts per billion allowed under the UL 867 standard. Plaintiffs do acknowledge that the testing conducted by Consumers' Union did return results in excess of the UL 867 tolerance. Furthermore, Plaintiffs' expert testing confirmed that the operation of the Ionic Breeze® in the presence of a terpene source results in an increased exposure to ultrafine particles, which Plaintiffs assert to be

32

Case No. 05-21251-Civ-Altonaga/Bandstra

more dangerous and damaging than the ozone alone.

Sharper Image responds that Plaintiffs' own testing could not establish the units produce more than the 50 ppb allowed under the UL 867, section 37 standard,[16] contrary to the allegations in the Amended Complaint. Moreover, complying with an emission standard of 50 ppb is voluntary for devices such as the Ionic Breeze®. Sharper Image's commissioned testing at reputable laboratories showed the product complied with UL 867, and does not exceed the 50 ppb. And, Sharper Image states no scientific research definitively establishes any dangers with ultrafine particles.

With the foregoing two elements disputed by Defendants' own testing, and given the uncertainties surrounding any award of damages, particularly an award against a company in a precarious financial position, the parties submit that this *Bennett* factor weighs strongly in favor of approval of the final version of the settlement agreement.

   2.   Range of Possible Recovery and the Point on or Below the Range of Possible
        Recovery at Which a Settlement is Fair, Adequate, and Reasonable

All Plaintiffs can say on the question of the range of possible recovery and the point on or below the range at which a settlement is fair, adequate, and reasonable, is that "[i]n contrast to the monumental uncertainties accompanying the trial of this action, the settlement provides real and immediate benefits to every class member and to the public at large." (*Pls' Mem. in Supp. of Final Approval* at 16). According to Sharper Image, "because a trial . . . would involve a battle of the experts and Plaintiffs have zero credible scientific evidence, their likelihood of success is dismal."

---

[16] According to Sharper Image's expert, Andrew Parker, complying with an emission standard of 50 ppb is voluntary for devices such as the Ionic Breeze®. The UL 867, section 37 standard incorporates 50 ppb as the acceptable level of ozone emission for air purifiers, which is consistent with the FDA standard for ozone emissions of medical devices of 50 ppb. (*Aff. of Andrew Parker* at 10-11).

33

Case No. 05-21251-Civ-Altonaga/Bandstra

(*Def's Omnibus Response* at 47).   The premise for the parties' conclusion that these two *Bennett*

factors favor the settlement is the "profound" (*Pls' Mem. in Supp. of Final Approval* at 16) benefit

to the class in obtaining a merchandise coupon/OzoneGuard and restrictions on Sharper Image

advertising of the product.   No analysis, however, has been provided as to the second and third

*Bennet* factors.

What Sharper Image does do, is offer an item-by-item recitation of the features of this coupon

settlement that make it different from other coupon settlements criticized by courts and commentators

in the field.   Because the Attorneys General had placed emphasis on the scholarship of law professor

Christopher R. Leslie,[17] a leading, nation-wide expert on coupon settlements, on June 20, 2007, after

the parties reviewed the objections of the Attorneys General, and prior to the June 22, 2007 filing by

the remaining objectors, the parties asked Professor Leslie to help them improve the early settlement

terms to address the concerns raised by the Attorneys General.   The parties accepted each and every

recommended change proposed by Professor Leslie.

Mr. Leslie has the following to say about the proposed settlement, or as he refers to it, the

TASA, although he did not testify at the final fairness hearing.

> . . . [T]he settlement reached a level, . . . that I could not only opine was fair,
> adequate, and reasonable, but such settlement, in my opinion, more than satisfies the
> CAFA standard and should provide an excellent model for post-CAFA coupon
> settlements in the future.
>
> . . . I have reviewed the . . . TASA. . . .   The opinions set forth in this affidavit are
> directed to the issue of whether the structure of the Merchandise Credits as set forth

---

[17] Mr. Leslie is a professor of law at Chicago-Kent College of Law.  He has written two major articles
on coupon settlements in class action lawsuits: *A Market-Based Approach to Coupon Settlements in Antitrust
and Consumer Class Action Litigation*, 49 UCLA L. REV. 991 (2002), and *The Need to Study Coupon
Settlements in Class Action Litigation*, 18 GEO. J. LEGAL ETHICS 1395 (2005).

Case No. 05-21251-Civ-Altonaga/Bandstra

in the TASA, read in the context of the overall coupon settlement's characteristics, maximize the $19 face value of the coupon and make this coupon settlement fair, adequate, and reasonable under Federal Rule of Civil Procedure 23 ("Rule 23"), CAFA, and the standards employed by federal courts . . . .

. . . It should be noted, however, that the issue of whether the face value of the Merchandise Credit, $19, is sufficient, is directly tied to the related science and merits of the claims asserted, which I am not qualified to address.

*          *          *

. . . [I]n my expert opinion the structure of this coupon settlement . . . maximizes the value of the $19 Merchandise Credit to the class and is exceedingly fair, adequate, and reasonable.  My bases for this opinion are as follows:

. . . *Transferability:* . . . [T]he most undesirable restriction in a coupon settlement is non-transferability of the coupons. . . .   Settlement Class members who do not wish to shop with Sharper Image . . . [may] avoid being forced to do so  – rather, they simply may sell their Merchandise Credits on the secondary market and obtain cash. . . .

. . . *Product Selection:* . . . [U]nder the TASA, Settlement Class Members, or persons to whom Merchandise Credits are transferred, may use those Merchandise Credits against ***any*** product sold by Sharper Image.  In this sense, the coupon is now ideal, because there are no restrictions on what it can be used to purchase. . . .

. . . *Duration of Redemption Period:* . . . [G]iven that the duration for redemption of the Merchandise Credits has been expanded, based on my recommendation, to two (2) years, there can be no doubt that the expiration period is relatively generous, that it allows sufficient time for Settlement Class Members to either redeem or sell their Merchandise Credits, and is less likely to compel Settlement Class Members to make purchases they otherwise would not make. . . .

. . . *Aggregation:* Many . . . coupon-based settlements provide a class member with multiple coupons but then forbid each class member from aggregating these coupons for use in a single purchase.  Such restrictions are designed to reduce redemption rates . . . .   [T]he TASA permits Settlement Class members to aggregate their Merchandise Credits, so that a Settlement Class member with five (5) Merchandise Credits is entitled to $95 off the purchase price of a product of his choosing, no matter the price of the product.  The only restriction on aggregations relates to transferred Merchandise Credits – no person may use more than five (5) transferred Merchandise Credits for the duration of the redemption period.  But these five (5) transferred Merchandise Credits may be aggregated by Settlement Class members. . . .

Case No. 05-21251-Civ-Altonaga/Bandstra

. . . *Administrative Restrictions/Claims Process:* Defendants sometimes attempt to reduce redemption rates "by making coupon redemption too complex or burdensome for all but the most hearty (and organized) class member." . . . Settlement Class Members in the database are automatically provided the codes for their Merchandise Certificates, and need take no further action . . . .   The remaining Settlement Class Members, not in the database, received notice . . . in *USA Weekend* and *Sports Illustrated*, and could log on to the settlement's website or complete a claim form in order to claim their Merchandise Credits . . . .

. . . *Allotment of Merchandise Credits to Settlement Class Members:* . . . [T]he TASA provides a two-tier structure for allotment of credits – one Merchandise Credit is awarded to Settlement Class members for each Ionic Breeze® unit purchased by that Settlement Class Member at a price greater than $100.00 . . . and only one Merchandise Credit is awarded per Settlement Class member for all Ionic Breeze® products purchased . . . at an individual price greater than $0.00 but less than or equal to $100.00 . . . .  This structure for allotment of Merchandise Credits to Settlement Class Members reflects that some Settlement Class Members are entitled to more Merchandise Credits than others . . . .

. . . *Cash Distribution or Cy Pres Fund:* The TASA includes a provision that should the redemption rate end up below 20%, then the defendant will distribute cash to approved charities. . . . The cy pres distribution term corresponds with CAFA's provision that the reviewing "court, in its discretion, may also require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations. . . ." . . .

. . . *Tying of Attorneys' Fees to Redemption Rates:* . . . [T]he TASA Settlement Class Counsel's compensation is not tied to ultimate redemption of the Merchandise Credits.  But this settlement should not be regarded as inadequate . . .

. . . In my experience, "[m]any, if not most, coupon settlements have been marked by low participation rates by class members," and in this way coupon settlements generally offer little to no relief to class members.

. . . In this case, however, I am genuinely very pleased to see a break from that norm of restrictive coupons and low redemption rates.

. . . The settlement coupons in this case do not have any of the restrictions that plagued pre-CAFA coupon settlements, which motivated Congress to require greater scrutiny.  This settlement more than satisfies the CAFA standard and should provide an excellent model for post-CAFA coupon settlements.

(*Aff. of Christopher Leslie* [D.E. 374] at 3-11) (emphasis in original).

Case No. 05-21251-Civ-Altonaga/Bandstra

3.      The Complexity, Expense, and Duration of Further Litigation

Plaintiffs state a trial of this action would require great expenditures of time and expense. Trial would likely involve the testimony of numerous scientific, marketing, and consumer experts, in addition to dozens, if not hundreds, of Ionic Breeze® purchasers.  Because of likely appellate proceedings, class recovery would be delayed for years.  Moreover, given Sharper Image's dramatic financial troubles, a delay in class recovery, according to Plaintiffs, could mean no recovery at all.

4.      The Substance and Amount of Opposition to the Settlement

Because only 533 of more than three million class members have opted out of the class, and only eight objectors have filed briefs, the nature of the response, the parties submit, strongly supports final approval of the settlement.  Moreover, the small and vocal minority of class members who have objected are fueled by would-be class counsel in competing lawsuits, so their objections are suspect. Furthermore, "the lion's share of the substantive objections" (*Pls' Mem. in Supp. of Final Approval* at 18) have been rendered moot by the enhancements the parties negotiated in the Third Agreement.

5.      The Stage of Proceedings at Which the Settlement Was Achieved

Settlement Class Counsel reviewed news coverage associated with the Ionic Breeze® before filing suit, and had knowledge and experience in another air purifier case, *Matthews v. Brookstone Stores, Inc.*, 431 F. Supp. 2d 1219 (S.D. Ala. 2006).  They retained two well-recognized experts in the indoor air quality field early in the case, and they reviewed all of the discovery and documents in this action as well as the documents produced in the California actions.

6.      Other Objections Raised to the Settlement

As to the objections concerning the meagre financial value of the settlement, the parties again point to the highly contested nature of the merits of the lawsuit and Sharper Image's bleak financial

37

Case No. 05-21251-Civ-Altonaga/Bandstra

outlook.  Sharper Image is among the smallest publicly traded companies, and before taxes in 2005, it had lost $29 million, and a staggering $99 million in the most recent fiscal year.  Sharper Image's Z-score, a widely accepted indicator of bankruptcy risk, indicates that the company is at high risk of bankruptcy in the next twelve months.  "Sharper Image is a company on the brink."  (*Pls' Mem. in Supp. of Final Approval* at 20).

The parties suggest that to the extent the Court is troubled by the absolute value of the settlement, Sharper Image's *cy pres* contribution should alleviate those concerns.  Because the realized value of the merchandise credits is expected to exceed $25 million, the requested attorney's fees and expenses of $1.875 million represents 7.5% of the expected value of all redeemed coupons.

As to the objectors' criticisms of the OzoneGuard provisions of the settlement, the parties insist the OzoneGuards significantly reduce ozone emissions, and because health benefits of the OzoneGuard are negligible with respect to non-floor models, and with the enhanced terms of the Third Agreement, the remaining objections to the OzoneGuard are eliminated.

As to the objectors' minimization of the benefits provided by the injunctive terms of the settlement, the parties state: "That Sharper Image does not currently use many of these representations  has no impact on the value of the injunctive relief to the class, as this and other lawsuits precipitated the reformed advertising practices, and the Settlement Agreement insures against backsliding into deceptive marketing."[18]  (*Id.* at 24).  Moreover, the advertising modifications address specific allegations made in the Second Amended Complaint that Sharper Image engaged in false

---

[18] Sharper Image emphasizes much of the objected-to advertising ceased around October-November 2006, at the time when the parties reached agreement on the key terms of the settlement, minus the issue of fees.

Case No. 05-21251-Civ-Altonaga/Bandstra

advertising with respect to the ability of the Ionic Breeze® to clean rooms of a particular size, with respect to the ability of the product to provide relief from asthma and immunity against allergies, with respect to the beneficial levels of ozone produced, with respect to the ability of the product to remove harmful chemicals found in flooring and paint, and with respect to representations made concerning other medical issues.  (*See SAC* at ¶¶ 8 (k), (l), (m), (n), (o), and (u)).

With respect to the adequacy of notice to the class, contained in Sharper Image catalogues and in *Sports Illustrated* and *USA Weekend*, the parties maintain the catalogue notices were the best form of notice to members who can be reasonably identified, and the notices in the two referenced publications are sufficient because these publications are widely distributed.  According to Andrew Novak, who specializes in the design and implementation of class action notification programs, approximately 81.5% of the settlement class members were exposed to the notice with respect to the settlement of this action.  (*See Aff. of Andrew Novak* [D.E. 394] at 4).

The parties dispute the notion that Class Counsel had a conflict of interest as a result of supporting the settlement and encouraging class members not to opt-out of the class.  The parties also emphasize Class Counsel had sufficient information as a result of discovery and the mediation process to value the case and to make an informed and rational decision regarding settlement prior to the first proposed settlement.

Finally, the parties insist that there was no collusion between them, and that no reverse auction occurred, as Potter suggests.  The lawsuit was filed in May 2005 and four different mediation sessions took place.  After a January 31, 2006 mediation proved unsuccessful, Class Counsel presented a general framework for negotiation to Sharper Image during a June 13, 2006 mediation. The parties reconvened for two separate mediations during October 2006 and engaged in informal

Case No. 05-21251-Civ-Altonaga/Bandstra

negotiations during that time period. Negotiations continued on a daily basis until the parties agreed to the terms for class relief on November 1, 2006, and submitted the Amended Settlement Agreement to the Court thereafter.

Given the concerns raised regarding the initial settlement terms, Class Counsel continued to negotiate enhanced class relief, and those efforts produced the Second and Third Amended Settlement Agreements. The existence of competing class actions is not dispositive; indeed, competing and simultaneous class actions are routine. Potter relies on a string of email communications between counsel for the parties, produced to him as a result of court order, to show collusion. In an email dated December 16, 2006, counsel for Sharper Image states: "[I]f we are unable to reach agreement before Thursday (Holiday vacations), I can tell you that the Board will rapidly diminish its interest in resolving the case through settlement, opting in favor of taking the Judge's lead and Staying/Abating the case, to focus exclusively on the upcoming trial in Potter." ([D.E. 368], Ex. 2 at 6).

The parties explain the foregoing quoted text is not evidence of collusion or a weakness in bargaining position by Class Counsel. Rather, the communication refers to the only outstanding issue between the parties at that time, the issue of attorney's fees, not to the fundamental provisions of the proposed settlement. The parties ultimately agreed on $1.875 million for fees and costs on December 27, 2006. The parties maintain continued negotiations between counsel, resulting in enhanced settlement terms, do not support a finding of collusion or of a reverse auction.

### F. The Final Fairness Hearing

The parties and several of the objectors provided additional relevant information at the final fairness hearing. Addressing the procedural fairness of the proposed settlement, Geoffrey Miller, law

40

Case No. 05-21251-Civ-Altonaga/Bandstra

professor at New York University Law School, testified as an expert on behalf of the parties.  Mr. Miller has published approximately 20 scholarly articles and papers on class action litigation.  In his opinion, the final version of the settlement is designed to provide real and substantive value to class members.  He opines that the settlement was the product of the "highest level of integrity and the highest competence on the part of both defense counsel and plaintiffs' counsel."  (*Aug. 16, 2007 Hearing Tr.* [D.E. 435, 436] at 140).

Mr. Miller found neither collusion nor a reverse auction from his review of the records, and his conversations with counsel for the parties.  Although he stated Plaintiffs' counsel voluntarily and on their own initiative demanded the initial settlement terms be enhanced, the undersigned notes that correspondence from Plaintiffs' counsel containing that demand also states "[o]ur conclusion was based on comments from potential objectors and the unexpectedly poor claim rate to date."  (*Id.* at 142).

Counsel for objector Potter reminded the Court that at the January 23 hearing concerning preliminary approval, Plaintiffs' counsel represented, "'as an officer of the Court, . . . this settlement is the best settlement that could be obtained for this class . . . with this company, and that's the simple fact of the matter and that's why it ought to be approved.'" (*Id.* at 87, ll. 19-24).  As already observed, what followed those remarks were numerous enhancements to the proposed, "best" settlement.  Furthermore, at the preliminary approval hearing, Class Counsel explained that Sharper Image was on the verge of bankruptcy, as a way of lending further support to the proposed coupon settlement,  and the bankruptcy concern was again repeated at the final fairness hearing, although no filing of bankruptcy had taken place.

41

Case No. 05-21251-Civ-Altonaga/Bandstra

Matthew B. Potter of Rust Consulting, the settlement administrator, submitted an affidavit [D.E. 393], reporting that as of July 27, 2007, Rust Consulting had received 13,552 claims and had received 533 valid opt-out requests. According to objector Potter's counsel, with approximately 3.4 million class members, the number of claims received equates to .4 percent, less than one percent of the total class. (*See id.* at 97). Objector Potter asserts the low percentage of claims received indicates class members are not interested in the proposed settlement. The low number bears on the consideration of what "value" the settlement has to class members. As Potter's counsel stated, "No one is interested in this because it's not worthwhile. There is no value for the consumer and the cy pres relief is designed to fail." (*Id.* at 108).

Counsel for objector Feinberg reported that "the national average on coupon redemption rates, it has been between 2 and 3 percent." (*Id.* at 113). According to his estimates, "[i]f 3 percent of those are redeemed, that means the class benefits, more or less, by about $3 million while Sharper Image was enriched by about $400 million in the sale of this product . . . ." (*Id.* at 114).

Ravi Dhar, professor of management and marketing at Yale University, estimates that 23 percent of the class members will redeem their merchandise credits. (*See id.* at 152; *see also, Aff. of Ravi Dhar* [D.E. 392]). Thirty percent of class members in the Sharper Image database, he estimates, will redeem their credits, a higher figure than the overall because those in the database automatically receive the credits. (*Aff. of Ravi Dhar* at 11). According to Mr. Dhar, a coupon is as close to cash as you can get. (*Aug. 17, 2007 Hearing. Tr.* at 21-22).

Jimmy Lee, inventor, President and Chief Executive Officer of Zenion, testified concerning the efficacy, and any dangers associated with use, of the Ionic Breeze®. (*See also, Aff. of Jimmy Lee* [D.E. 390]). His testimony would be used by Sharper Image to rebut the claims asserted.

42

Case No. 05-21251-Civ-Altonaga/Bandstra

## II. ANALYSIS

### A.    *Governing Standards*

This action was settled prior to class certification.[19]  Regardless of whether a class is certified for settlement or for trial, the Court must find these prerequisites are met: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

The proposed class must also meet the requirements of one of the three class types found in Rule 23(b).  In this case, the parties sought certification under Rule 23(a), as well as Rule 23(b)(3), which provides that "the questions of law or fact common to the members of the class predominate" over individual issues of law or fact and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Finding that the Rule 23(a) and (b) standards were satisfied, the settlement class was preliminarily certified.  (*See* [D.E. 245]).

Under Rule 23(e)(1)(A), Fed. R. Civ. P., "[t]he court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class."  Under Rule 23(e)(1)(C), the court may approve a settlement that will bind a class "only after a hearing and on

---

[19] A class may be certified "solely for purposes of settlement where a settlement is reached before a litigated determination of the class certification issue."  *Woodward v. Nor-Am Chem. Co.*, 1996 WL 1063670, at *14 (S.D. Al. 1996) (citing *In re Beef Indus. Antitrust Litig.*, 607 F.2d 167, 173-78 (5th Cir. 1979), *cert. den.*, 452 U.S. 905 (1981)).  In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997), the Supreme Court held that because a settlement class action obviates a trial, the district judge deciding whether to certify a settlement class action "need not inquire whether the case, if tried, would present intractable management problems," under Rule 23(b)(3)(D).  However, other portions of Rule 23 "– those designed to protect absentees by blocking unwarranted or overbroad class definitions – demand undiluted, even heightened attention in the settlement context."  *Id.*

Case No. 05-21251-Civ-Altonaga/Bandstra

finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate." The earlier versions of the parties' settlement agreement were approved preliminarily. While "[the] preliminary determination establishes an initial presumption of fairness," *In re General Motors Corp.*, 55 F.3d 768, 784 (3d Cir. 1995) (citation omitted), it is only that, a presumption. Moreover, where, as here, a settlement is negotiated between parties prior to class certification, "it is subject to a higher degree of scrutiny in assessing its fairness." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (citations omitted).

Admittedly, there exists "an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Assoc. for Disabled Am., Inc. v. Amoco Oil* Co., 211 F.R.D. 457, 466 (S.D. Fla. 2002); *Access Now, Inc. v. Claire's Stores, Inc.*, 2002 WL 1162422, at *4 (S.D. Fla. 2002) (both citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). A proposed class action settlement should be approved as long as it is "fair, adequate and reasonable and is not the product of collusion between the parties." *Bennett*, 737 F.2d at 986 (citation omitted). Moreover, the Court must "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Reynolds*, 288 F.3d at 279.

The Eleventh Circuit has described the relevant factors that the Court should consider in determining whether a settlement is fair, adequate, and reasonable, and these have been addressed in the factual summary of this Order. Again, they are:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986 (citations omitted). In assessing these factors, the Court "should be hesitant

44

Case No. 05-21251-Civ-Altonaga/Bandstra

to substitute . . . her own judgment for that of counsel." *In re Smith*, 926 F.2d 1027, 1028 (11th Cir.

1991) (citation omitted).  Furthermore,

> [T]he judge must guard against the temptation to become an advocate  –  either in favor of the settlement because of a desire to conclude the litigation, or against the settlement because of the responsibility to protect the rights of those not parties to the settlement.  In reviewing the settlement the judge is called upon to be impartial and neutral, favoring neither the proponents of the settlement nor those who are opposed or absent.

*Id.* (quoting *Moore's Federal Practice, Manual for Complex Lit. 2d* § 23.14 at 160 (1986)).

Nevertheless, the Court's role in reviewing a settlement agreement is "akin 'to the high duty of care

that the law requires of fiduciaries.'" *Synfuel Tech.*, 463 F.3d at 652-53 (quoting *Reynolds*, 288 F.3d

at 279)).

The issues presented that bear upon whether to grant final approval here are: (a) whether the

settlement was procured by collusion among the parties or was the result of arms-length and informed

bargaining; and (b) whether the proposed final settlement is fair, adequate and reasonable, applying

the six *Bennett* factors.  In addition, the Court is to evaluate the fairness of the parties' proposed

settlement under the standards contained in the CAFA.

On February 18, 2005, the CAFA was signed into law.  The Act applies to actions

"commenced" on or after the day of its enactment, CAFA § 9, 28 U.S.C. § 1332, and has as one of

its stated purposes "to assure fair and prompt recoveries for class members with legitimate claims."

Pub. L. No. 109-2, Sec. 2 (b)(1).  Because this action was commenced on May 6, 2005, the CAFA

applies.

Section 3 of the CAFA contains a "Consumer Class Action Bill of Rights and Improved

Procedures for Interstate Class Actions."  28 U.S.C. §§ 1711-1715.  Of particular relevance to this

Case No. 05-21251-Civ-Altonaga/Bandstra

case, section 1712 contains provisions designed to protect class members by setting forth the bases

upon which coupon settlements may be approved. Section 1712(e) provides, in pertinent part:

> **Judicial Scrutiny of Coupon Settlements**. – In a proposed settlement under which class members would be awarded coupons, the court may approve the proposed settlement only after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable, and adequate for class members. The court, in its discretion, may also require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations, as agreed to by the parties. The distribution and redemption of any proceeds under this subsection shall not be used to calculate attorneys' fees under this section.

While the CAFA was designed to ameliorate unfair coupon settlement practices, by, in part,

requiring the trial court to make written findings of the fairness of a coupon settlement, the standards

contained in the CAFA, "fair, reasonable, and adequate," are identical to the standards already

provided in Fed. R. Civ. P. 23(e)(1)(C) and governing case law. *See* J. Brendan Day, *My Lawyer*

*Went to Court and All I Got Was This Lousy Coupon!*, 38 SETON HALL L. REV. ___ (forthcoming,

Oct. 2008) (advocating an amendment to the CAFA providing district judges with a test that

presumptively invalidates all coupon settlements to enable the CAFA to filter out substantively

harmful settlement proposals and restore fundamental fairness to the class action system). Moreover,

the trial court's finding of fairness, reasonableness, and adequacy pre-CAFA also followed a final

fairness hearing, and was generally reduced to writing. However, because the CAFA requirement

in section 1712(e) applies only to coupon settlements, and because it is codified to further Congress'

objectives and concerns regarding the fairness *vel non* of coupon settlements in particular, the

undersigned interprets the statutory directive to imply the application of a greater level of scrutiny

to the existing criteria than existed pre-CAFA. In any event, coupon settlements have been severely

criticized by commentators in the field, including Professor Leslie, and, as is evident here, are strongly

46

Case No. 05-21251-Civ-Altonaga/Bandstra

disfavored by the Attorneys General of most of the states.  It is against this backdrop that the undersigned undertakes her review of the procedural and substantive fairness of the proposed settlement.

**B.    *Procedural Fairness***

In considering the procedural fairness of a settlement, the Court must determine if the settlement "was achieved through arms-length negotiations by counsel with the experience and ability to effectively represent the class's interests." *Becher v. Long Island Lighting Co.*, 64 F. Supp. 2d 174, 178 (E.D.N.Y. 1999) (citing *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982)).  The inquiry must address whether the settlement is the result of fraud or collusion or was achieved in good faith following arms-length negotiations.  *See Knight v. Alabama*, 469 F. Supp. 2d 1016, 1031 (N.D. Al. 2006) (citing *Cotton*, 559 F.2d at 1330).  The Court has to ensure that the class members' interests were adequately represented by counsel unimpaired by a lack of experience or ability.  In this case, the timing and form of the settlement negotiations, the weaknesses of the suit as compared to the other pending class actions, and the substance of the initial settlement agreement are all factors relevant to the inquiry.

There is no evidence of fraud or collusion between Class Counsel and counsel for Sharper Image.  That concern may be quickly disposed of.  What cannot be so easily eliminated is the perception, and the undersigned's conviction, that Sharper Image selected counsel confronted with a most precarious position, insisted upon amendments to the pleading to broaden the scope of this litigation to obtain a global peace, and then proceeded to offer and convince Class Counsel to accept highly undesirable terms to settle the case.  What followed, the tinkering with the settlement proposals, has resulted in a near-perfect coupon settlement, one that even Professor Leslie may

47

Case No. 05-21251-Civ-Altonaga/Bandstra

approve, but which is the product of procedural unfairness.

The detailed recitation of the procedural history of this case was necessary in order to properly address this issue of procedural fairness *vel non* with the proposed settlement.  Plaintiffs filed this suit against Sharper Image and Zenion, adding Zenion in an effort to differentiate the case from the earlier and pending state actions, and to prevent a stay or dismissal of this case.  Sharper Image vigorously litigated its request that the undersigned abate, stay or dismiss the action in favor of the California actions, and it was only the presence of Zenion that prevented a stay from being granted.  Once the undersigned found, however, that it had no jurisdiction over Zenion, and dismissed Zenion from the suit, the case was susceptible to Sharper Image re-asserting its two earlier motions to abate and/or dismiss.  Indeed, such a request by Sharper Image is what the undersigned anticipated would follow from Zenion's exit from the case.

Instead of that occurring, however, and prior to any decision on class certification, Sharper Image began and pursued negotiations with Plaintiffs' counsel, doing so with sealed filings and proceedings on the eve of a class certification process, abandoning its earlier efforts to have the case stayed.  Plaintiffs' counsel were fully aware that a request for a stay might very well be granted given that Zenion was no longer a party-defendant.  Thus, Plaintiffs' counsel necessarily negotiated from a position of weakness, with the specter of a stay of this case a constant companion.  The email communication between counsel for Sharper Image and Class Counsel, wherein the former warns the latter that Defendant may opt "in favor of taking the Judge's lead and Staying/Abating the case, to focus exclusively on the upcoming trial in Potter," may have been stated in reference to a disagreement over fees following initial "settlement," but it is indicative of the pressure Class Counsel were under to reach a settlement before Defendant renewed its request for an abatement a third time.

48

Case No. 05-21251-Civ-Altonaga/Bandstra

Information obtained by Potter in discovery in this case also confirms Class Counsel negotiated from a position of weakness.  A series of email communications (*see* Exs. of *Aff. of Daniel Birkhaeuser* [D.E. 368], Ex. 2), reveals Plaintiffs began by demanding a coupon in the amount of four-fifths of the purchase price of each Ionic Breeze® purchased by class members.  Using as an example the advertised price of the Ionic Breeze Quadra, 80% of the purchase price would be approximately $279.96.  Sharper Image offered a $5 coupon.

Within two weeks of that exchange, the day before class certification was to be heard, Plaintiffs dropped their demand to a flat rate $28.50 coupon, a drop of close to one thousand percent, again using the Quadra as an example.  Then, in the space of 11 hours, Plaintiffs dropped their demand from $28.50 to $19, the coupon presently under consideration.  The written negotiations do not reveal any evidence of a risk analysis, any attempt to determine whether the products had any value to the clients making them worth only $19 less than Plaintiffs had paid for them, or any other reason why $19 was an acceptable number.  "For Plaintiffs to have brokered a fair settlement, they must have been armed with sufficient information about the case to have been able to reasonably assess its strengths and value."  *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 396 (C.D. Cal. 2007). Given the undersigned's orders limiting discovery to class certification issues, it appears Plaintiffs had limited information concerning the merits of the case when they undertook to settle the claims on the eve of class certification.

The parties' negotiations also included a significant broadening of the claims presented via the SAC, which in and of itself is not suspect.  *See, e.g., Lipuma v. American Express Company*, 406 F. Supp. 2d 1298, 1316 (S.D. Fla. 2005) ("'defendants may properly 'insist upon amendments to the pleadings broadening the scope of the action prior to settlement, in an effort to 'cover everything'

49

Case No. 05-21251-Civ-Altonaga/Bandstra

and insure that the settlement will in fact result in an end to litigation.'") (quoting *Trotsky v. Los Angeles Fed. Sav. and Loan Assoc.*, 48 Cal. App. 3d 134, 147-48, 121 Cal. Rptr. 637 (1975) (citations omitted)).  However, the broadening of the claims, certainly made to assure Sharper Image that all possible claims could be resolved in this case, as compared to the narrower universe of claims addressed in the California actions, is further evidence of Sharper Image controlling the course of the negotiations.

The initial products of the settlement negotiations presented to the Court, the original Settlement Agreement and the Amended Settlement Agreement, were woefully deficient, as has been borne out by the detailed and substantive objections of the Attorneys General and the several objectors, including a review of the pertinent literature concerning coupon settlements.  Certainly any initial "presumption of the fairness" of the earlier settlement agreements, *see, e.g., In re General Motors Corp.*, 55 F.3d at 784, has been dispelled, even by the parties, who have incorporated the many objections raised by changing material terms of the agreements.

Class Counsel agreed to a coupon settlement Professor Leslie would certainly not have approved, and the parties acknowledge this by their later retention of Mr. Leslie and their adoption of the suggestions presented by the Attorneys General and the several objecting parties.  The value of the coupons was increased, and the deficiencies noted on the key points of transferability, product selection, duration of redemption period, aggregation, the administrative restrictions and claims process, and the lack of a *cy pres* fund, were addressed in two separate and subsequent versions of the settlement.  Throughout the process of improving a defective and unfair settlement agreement, however, Class Counsel simply incorporated enhancements suggested by others to the objected-to terms.  Class Counsel started out in a position of weakness, and their effectiveness at improving a

50

Case No. 05-21251-Civ-Altonaga/Bandstra

defective product is the result of the strenuous and well-presented arguments of the objectors, rather than an informed arms-length negotiation process undertaken by well-positioned counsel.

On this first point of the procedural fairness *vel non* of the settlement, therefore, the undersigned finds that, on balance, the settlement is not the product of informed, arms-length negotiations between effective Class Counsel and the Defendant. Sharper Image did play these Plaintiffs off against the California actions, even conditioning a settlement here to the entry of an injunction prohibiting the already-certified California actions from going forward,[20] to structure a poor settlement with weak parties.

**C.    Substantive Fairness**

The second prong of the Court's analysis is to review the six *Bennett* factors and determine whether the proposed settlement is fair, adequate and reasonable. The parties' positions on the six factors have already been summarized. Below is the Court's analysis on the six factors.

1.    Likelihood of Success at Trial

Plaintiffs' likelihood of success at trial is not only the first *Bennett* factor, it is also "by far the most important factor" in evaluating a class action settlement. *Knight*, 469 F. Supp. 2d at 1032-33 (citing *In re Domestic Air Transp. Litig.*, 148 F.R.D. 297, 313 (N.D. Ga. 1993)). "The likelihood of success on the merits is weighed against the amount and form of relief contained in the settlement." *Lipuma*, 406 F. Supp. 2d at 1319. "The 'most important factor relevant to the fairness of a class action settlement' is the first one listed: 'the strength of the plaintiff's case on the merits balanced against the amount offered in the settlement.'" *Synfuel Tech.*, 463 F.3d at 653 (quoting *In re General*

---

[20] At the time, the California actions had an April 16, 2007 trial date.

Case No. 05-21251-Civ-Altonaga/Bandstra

*Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979) (citing the MANUAL FOR COMPLEX LITIGATION § 1.46 at 56 (4th ed. 1977)).

Plaintiffs' six causes of action (breach of contract, breach of express warranty, unjust enrichment, money had and received, and unfair business practices and false advertising) are contested, and Sharper Image has marshaled expert opinion and laboratory testing results to disprove the two key allegations upon which the claims are based. The first is that the Ionic Breeze® does not perform as Sharper Image advertised it would. The second is that the product is harmful because of its emission of harmful levels of ozone. That the claims are contested, however, is not to say the claims are weak.

The several suits filed against Sharper Image over its advertising and sales of the Ionic Breeze® product stem from articles published beginning in 2002 by *Consumer Reports*, a well-respected, third-party magazine that tests products. In the February 2002 issue, *Consumer Reports* compared the speed at which sixteen different air cleaners could reduce pollutants like dust and tobacco-smoke articles from the air in a sealed test room using the CADR method. *Portable Room Air Cleaners*, CONSUMER REPORTS (Feb. 2002) at 46-47; ([D.E. 300], Ex. C). The Ionic Breeze® ranked last among the models tested and received a total rating of "poor." The article stated the Ionic Breeze Quadra resulted in "almost no measurable reduction in airborne particles." (*Id.* at 46).

Then, in October 2003, after Sharper Image complained about the earlier issue, *Consumer Reports* published another article in which an independent expert reviewed its test procedures and again tested the Quadra against other air cleaners. *See Air Cleaners Behind the Hype*, CONSUMER REPORTS (Oct. 2003) at 26-29; ([D.E. 300], Ex. D). The magazine then ranked the Quadra second to last among 18 units tested, and again stated it was "not effective." *Id.* at 26, 29.

52

Case No. 05-21251-Civ-Altonaga/Bandstra

In May 2005, *Consumer Reports* reported that "some of the least effective ionizing models can expose you to potentially harmful ozone levels, especially if you're among the roughly 80 percent of buyers with asthma or allergy concerns." *New Concerns About Ionizing Air Cleaners,* CONSUMER REPORTS (May 2005); ([D.E. 300], Ex. E). The article stated that "[O]zone concentration more than 80 [parts per billion] can cause coughing, wheezing, and chest pain while worsening asthma and deadening your sense of smell. It also raises sensitivity to pollen, mold, and other respiratory allergy triggers, and may cause permanent lung damage." *Id.*.

Sharper Image sued, alleging Consumers Union had made false statements about the Ionic Breeze Quadra, in *Sharper Image Corp. v. Consumers Union of U. S.*, No. 03-4094 MMC (N. D. Cal. filed on Jan. 23, 2004). In ruling on defendant's Anti-SLAPP[21] motion to strike, which required Sharper Image to show a probability that it would prevail at trial, the district court concluded that Sharper Image had no probability of prevailing at trial. *See Sharper Image*, 2004 WL 2554451, at *2. The court stated that Sharper Image "has not offered any evidence to support a finding that CADR methodology is, per se, inapplicable to the [Quadra]. Indeed, the evidence is to the contrary." *Id.* at *7. The court concluded that "Sharper Image has not shown a reasonable probability of proving any of Consumers Union's challenged statements are false by reason of the results of Consumers Union own testing." *Id.* at *16. The court also explained "[b]ecause Consumers Union disclosed that the IBQ did remove some particles from the air, albeit 'slowly,' a reader would not

---

[21] "Anti-SLAPP" is an acronym for "Anti-Strategic Lawsuit Against Public Participation." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 837 (9th Cir. 2001). An Anti-SLAPP motion is brought almost immediately after a complaint is filed and is designed to dispose of lawsuits that implicate First Amendment rights. Here, the applicable California Anti-SLAPP statute is found under the California Code of Civil Procedure, Section 425.15.

Case No. 05-21251-Civ-Altonaga/Bandstra

understand Consumers Union to be claiming that the IBQ performed no better than 'natural decay,'

*i.e.*, where no air cleaner was used." *Id.* at *13.

A Sharper Image advertisement of the Ionic Breeze®, filed by Objector Potter ([D.E. 367]

Ex. A), made the following representations:

Pure Air.  Perfect Silence.

The Ionic Breeze™ Silent Air Purifier is one of the greatest new products I've ever used.  That may seem like a strong statement from someone who's spent his career finding the world's most advanced home products.  But it's true.

And here's why: For the first time ever, we've developed a way to circulate and clean air without using a fan.  This is truly revolutionary!  Until now, big, noisy fans were the only way to move air and get it clean.

But our exclusive Zenion Effect technology actually moves air and cleans it as well – or better – than old-fashioned, fan-based systems.

You have to try it to believe it.  It's an air purifier of the highest quality.  It traps practically all airborne particles.  It removes smoke, dust, pet dander and mold spores – even bacteria and microscopic viruses.  It kills odors.  It keeps room surfaces clean.  It requires almost no maintenance.  It saves over $300 a year in replacement filters and energy costs.  And it does it all in complete silence!

You have my personal assurance that you, too, will be absolutely delighted with the Ionic Breeze Silent Air Purifier.  Order now and experience this exciting development in cleaner air – risk free for 60 days.  If you're not completely satisfied, simply return it.  We'll even pay the return postage.

Sincerely,

Richard Thalheimer, Founder
The Sharper Image

The *Consumer Reports* testing, and testing by Plaintiffs' experts, Dr. Richard Shaughnessy

and Dr. Jeffrey Siegel, found that under the CADR measure of air cleaner performance, the Ionic

Breeze® was ineffective at removing contaminants and cleaning the air.  Sharper Image's experts and

54

Case No. 05-21251-Civ-Altonaga/Bandstra

independent testing, as well as satisfied customers' reports, showed that under other measures of air cleaner performance, the Ionic Breeze® was quiet, energy-efficient, and did perform where it was operated for longer periods of time than under the CADR measure.  That the question of the product's effectiveness is contested is not to say that Plaintiffs' claims, based on the effectiveness criterion, are weak.  And while the Sharper Image advertisements did not guarantee a particular level of cleanliness or efficiency, the advertisements did represent the product "moves air and cleans it as well – or better – than old-fashioned, fan-based systems," a statement not supported under the CADR.  Armed with the *Consumer Reports*' testing, and that of its own experts, Plaintiffs' claims, which would need to be proved to a jury by the greater weight of the evidence, appear to be strong, not weak.

As to the second allegation upon which Plaintiffs' claims are based, that the product is harmful because of the level of ozone emitted, at least one Underwriters Laboratories ozone test commissioned by Sharper Image showed that the Ionic Breeze S1720 exceeded the U.S. safety standards for ozone.  (*See Aff. of Daniel E. Birkhaeuser* [D.E. 368], Ex. 2).  And while Consumers' Union testing did return results in excess of the UL 867 tolerance, Plaintiffs' expert testing did not confirm this.  Thus, this element of Plaintiffs' claim is weak.

On balance, on the first *Bennett* factor, Plaintiffs appear to have a strong likelihood of succeeding at trial on some of their causes of action which rely on the ineffectiveness of the product.

> 2-3.   <u>Range of Possible Recovery and the Point on or Below the Range of Recovery at Which a Settlement is Fair</u>

The next *Bennett* factors are the range of possible recovery and the point on or below the range at which a settlement is fair, adequate and reasonable.  These factors are generally analyzed

Case No. 05-21251-Civ-Altonaga/Bandstra

together.  *See Behrens v. Wometco Enter., Inc.*, 118 F.R.D. 534, 541 (S.D. Fla. 1988).  On the range

of possible recovery, the Court resolves damages issues.  The range of potential recovery "spans from

a finding of non-liability through varying levels of injunctive relief," in addition to any monetary

benefits to class members.  *Lipuma*, 406 F. Supp. 2d at 1322 (quoting  *Assoc. for Disabled*

*Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 468 (S.D. Fla. 2002)).

Certainly the Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation,

but rather, to evaluate the proposed settlement in its totality.  *Id.* (citations omitted).  And "the fact

that a proposed settlement amounts to only a fraction of the potential recovery does not mean the

settlement is unfair or inadequate."  *Behrens*, 118 F.R.D. at 542 (citing *City of Detroit v. Grinnell*

*Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974)).

The *Synfuel* court has described the approach as follows:

> In conducting this analysis, the district court should begin by "quantify[ing] the net
> expected value of continued litigation to the class."  *Reynolds*, 288 F.3d at 284-85.
> To do so, the court should "estimat[e] the range of possible outcomes and ascrib[e]
> a probability to each point on the range."  *Id.* at 285.  Although we have recognized
> that "[a] high degree of precision cannot be expected in valuing a litigation," the court
> should nevertheless "insist[] that the parties present evidence that would enable []
> possible outcomes to be estimated," so that the court can at least come up with a
> "ballpark valuation."  *Id.* at 285.

463 F.3d at 653.

The parties offer very little to assist the Court in its analysis of the range of possible outcomes

and probabilities as to each point on that range.  Recovery in this case, for each class member, varies

from as little as zero to as much as a full refund for every Ionic Breeze® purchased, as well as

disgorgement by Sharper Image of its sales proceeds, along with the injunctive remedies concerning

advertising and future representations, and the furnishing of OzoneGuards.  No evidence or other

56

Case No. 05-21251-Civ-Altonaga/Bandstra

showing was made that would enable the Court to estimate possible outcomes, other than the two extremes noted. Plaintiffs' analysis of these combined *Bennett* elements essentially consisted of the following statement: "In contrast to the monumental uncertainties accompanying the trial of this action, the settlement provides real and immediate benefits to every class member and to the public at large." (*Pls' Mem. in Supp. of Final Approval* at 16).

The problem with this simplistic approach is it does not address that which even Professor Leslie could not express an opinion on. Recall that Professor Leslie qualified his praise of this near-perfect coupon settlement with the following critical observation: "It should be noted, however, that the issue of whether the face value of the Merchandise Credit, $19, is sufficient, is directly tied to the related science and merits of the claims asserted, which I am not qualified to address." (*Aff. of Christopher Leslie* at ¶ 8). The issue of whether the $19 is sufficient has still not been answered.

In any event, the possibility of a jury exonerating Sharper Image of all wrongdoing appears to be less likely than Plaintiffs prevailing on at least one of their claims. And while the claims for breach of contract and breach of warranty limit Plaintiffs to recovering economic damages, the claims for unjust enrichment and for violations of the states' unfair business practices statutes do not. Plaintiffs claim that Defendant made hundreds of millions of dollars on sales of the Ionic Breeze®.

In contrast, the proposed settlement gives class members a $19 credit for purchases made at Sharper Image. Rather than resulting in Defendant disgorging any wrongfully obtained gains, the result will likely be increased sales of Defendant's products to class members or any third-parties who may wish to purchase the $19 coupons from class members. While the final version of the settlement does not force class members to do business with Defendant, unless class members find a purchaser willing to buy the coupons for their face value (an unlikely event), then class members will gain even

Case No. 05-21251-Civ-Altonaga/Bandstra

less than a $19 discount for a Sharper Image product. *See In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001) ("[C]ompensation in kind is worth less than cash of the same nominal value.").

Given the very low numbers of class members who have responded with interest to the notices provided – less than one percent – the undersigned must agree with objector Potter that the class has spoken and expressed it is not interested in this coupon settlement. The proposed settlement, in which Class Counsel receive close to $2 million in fees and class members are given a $19 coupon, is below the range of recovery in which a settlement of this case may be considered fair.

4.    Complexity, Expense and Duration of Litigation

Regarding the complexity and expense of litigating this case, rather than settling it now, the Court should consider the uncertainties of litigation, the possibility of relief in the future, whether the litigation is expected to be protracted and expensive, and compare those findings to the benefits of immediate recovery. *See Lipuma*, 406 F. Supp. 2d at 1323 (citing *In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993)). Here, the continued concern over Sharper Image's precarious financial position has remained constant, prompting Class Counsel to seek approval of the inadequate first proposed settlement, down to the present version. *See, e.g., In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 306 (N.D. Ga. 1993) (noting during fairness analysis that "precarious financial condition of defendants makes the likelihood of collection of any judgment dubious"). After the final fairness hearing, Plaintiffs even submitted a Supplemental Memorandum [D.E. 439] explaining that no materially better settlement can be achieved and a cash distribution in any worthwhile amount is "plainly impossible." (*Id.* at 2). Possibility of a greater recovery in the future, thus, appears questionable.

Case No. 05-21251-Civ-Altonaga/Bandstra

Given the parties' marshaling of documentary evidence and experts, however, it appears not much additional investment of time and resources is necessary to prepare the case for trial. While there may be additional expense and discovery, it is certainly far less than the parties otherwise would have had to address in the absence of the information exchanged to date.

The undersigned agrees with the Attorneys General's view that because the proposed payout here is of negligible value, the small risk of receiving nothing is worth taking. On balance, this *Bennett* factor also favors a rejection of the proposed settlement.

5.   Substance and Amount of Opposition to the Settlement

The reaction of the class is an important factor in gauging whether a settlement is fair, reasonable and adequate. *See Lipuma*, 406 F. Supp. 2d at 1324 (citation omitted). While a low percentage of objections points to the reasonableness of a proposed settlement, a high percentage of objections signals that a proposed settlement is not fair or reasonable. *See id.*

Few class members have expressed interest in the parties' proposed settlement, and few have objected. Those who have objected, however, have done so most strenuously and with valuable insights. Indeed, many of the revisions to the initial terms of the proposed settlement result from the salient points brought out by the objectors and their counsel.

What distinguishes this case from other class actions, however, is the singular appearance of the Attorneys General of thirty-five states and the District of Columbia, representing hundreds of thousands, if not millions, of eligible class members. Appearing as *amicus curiae* on behalf of their citizens, the Attorneys General have objected at every turn to each version of the parties' proposed coupon settlement. The Attorneys General of Florida, Idaho, Illinois, Tennessee, Vermont, and the District of Columbia continue to object to the final version. (*See Notice by Attorneys General* [D.E.

Case No. 05-21251-Civ-Altonaga/Bandstra

413]).  The vigor and substance of the objections presented counsels against a finding favorable to the parties on this *Bennett* factor.

### 6.   The Stage of the Proceedings at Which Settlement was Achieved

This factor is related to the undersigned's conclusion that the settlement suffers procedural infirmities.  Class Counsel negotiated the case before class certification, and while they had been denied merits discovery because of the pendency of the class certification issue.  They had insufficient information available to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation.  *See Lipuma*, 406 F. Supp. 2d at 1324 (citation omitted).  This factor, too, weighs against a finding favorable to the parties.

## III.  CONCLUSION

Before the passage of the CAFA, the Senate Judiciary Committee described coupon settlements in this way:

> [A]busive class action settlements in which plaintiffs receive promotional coupons or other nominal damages while class counsel receive large fees are all too commonplace.  The risk of such abusive practices is particularly pronounced in the class action context because these suits often involve numerous plaintiffs, each of whom has only a small financial stake in the litigation.  As a result, few (if any) plaintiffs closely monitor the progress of the case or settlement negotiations, and these cases become "clientless litigation," in which the plaintiff attorneys and the defendants have "powerful financial incentives" to settle the "litigation as early and as cheaply as possible, with the least publicity."  These financial incentives create inequitable outcomes.  For class counsel, the rewards are fees disproportionate to the effort they actually invested in the case . . . .  For society, however, there are substantial costs: lost opportunities for deterrence (if class counsel settled too quickly and too cheaply), [and] wasted resources (if defendants settled simply to get rid of the lawsuit at an attractive price, rather than because the case was meritorious) . . . .

S. Rep. 109-14, at 32 (footnotes omitted).

Case No. 05-21251-Civ-Altonaga/Bandstra

The undersigned cannot make the requisite written finding under Rule 23(e) or the CAFA, 28 U.S.C. §1712(e), that the Third Amended Settlement Agreement is procedurally or substantively fair, adequate, or reasonable.  Sharper Image's precarious financial position and enhancements to what is nothing more than a coupon settlement do not make it so.  In light of the foregoing analysis, the parties' request that the Court approve the Third Amended Settlement Agreement is **DENIED**. Consequently, Intervenor-Objector Alicia Bryant's Application for Award of Attorneys' Fees and Costs [D.E. 312], and Class Counsel's Application for Award of Fees and Expenses [D.E. 358] are **DENIED**.

Within fourteen (14) calendar days of the date of this Order the parties are to submit to the court a joint scheduling report, under Local Rule 16.1, addressing remaining pre-trial proceedings, deadlines and a trial date.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 11th day of October, 2007.

*Cecilia M. Altonaga*
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:   Magistrate Judge Ted Bandstra
       counsel of record